



$1:OOCV274$



FILED
SCRANTON

AUG 1 6 2002

PER

DEPUTY CLERK

## E X H I B I T S

## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT



# Attachment 4

 **UNITED STATES POSTAL SERVICE**

February 7, 1997

| | |
|---|---|
| **MEMORANDUM FOR:** | **All Employees**<br>**Boston Processing &**<br>**Distribution Center** |
| **SUBJECT:** | **General Notice of Reduction-in-Force (RIF)** |

This is an advance informational notice to alert all employees assigned to the Boston Processing & Distribution Center, that a Reduction-in-Force (RIF) within your competitive area is necessary as a result of various operations being moved from the Boston Processing & Distribution Center to the Northwest Boston Plant. This RIF will not impact any bargaining unit employee or the majority of the nonbargaining employees.

The effective date of the RIF is May 24, 1997. It is anticipated that the RIF will result in reassignment of EAS employees to positions at a lower grade level.

With the opening of the Northwest Boston Plant, in an effort to enhance service to our customers, state of the art automation equipment was deployed and mail was reassigned, resulting in a decrease of approximately 35% in mail processing at the Boston Processing & Distribution Center. This has resulted in a loss of bargaining and nonbargaining unit positions at the Boston Processing & Distribution Center.

Prior to the issuance of specific notices of RIF, every effort will be made to minimize the impact. Those employees who will be identified for a possible RIFaction will be hearing from management accordingly.

Because a RIF is being conducted in your competitive area, you should review your latest Form 50, Notification of Personnel Action, prior to February 25, 1997, to verify that it is accurate and includes any entitlements to veteran preference.

If you have any questions concerning this notice, you should contact Robert J. Tripoli, Human Resources Specialist at (617) 654-5539.

*K. F. Winters*

**Kenneth F. Winters**
**Plant Manager**

EXHIBIT 1



$(1) - 1$

 **UNITED STATES**
**POSTAL SERVICE**

March 14, 1997                              CERTIFIED MAIL NO. Z132668647

OLIVER STEVENSON JR
5 TSIENNETO RD # 137
DERRY NH 03038-1553

SUBJECT:        SPECIFIC NOTICE OF REDUCTION-IN-FORCE

This letter is specific notice that a reduction in force (RIF) is being conducted within the BOSTON
PROC/DIST CTR. This reduction in force is necessary due to movement of various operations to
the Northwest Boston Plant.

I regret to inform you that you will be released from your position of SR MGR DISTRIBUTION
OPERATIONS, 2315-7138, EAS-25 and will be separated from the U.S. Postal Service effective
May 24, 1997. No offer of placement can be made at this time because all positions in your
competitive level will be abolished. You will be advised if a more favorable offer becomes
available prior to the effective date.

You may request to be placed into a 30-day non-pay, non-duty status beginning May 25, 1997. If
you remain unplaced at the end of the 30-day period, you will be separated. Information
concerning retirement, severance pay, disposition of unused leave and unemployment
compensation is enclosed.

The following information was used to determine your rights in this reduction-in-force:

| | |
|---|---|
| Competitive Area: | **BOSTON PROC/DIST CTR** |
| Location: | **BOSTON, MA** |
| Competitive Level | **L00515** |
| Tenure Group/Subgroup | **I-B** |
| RIF Service Date: | **2/26/54** |
| Performance 1996: | **Met Objectives/Expectations** |
| Performance 1995: | **Not Available** |
| Performance 1994: | **Not Available** |
| Performance 1993: | **Not Available** |

Your personnel office is available to assist you by explaining this proposed action and will provide
access to retention registers, and other records that are pertinent to you. You are entitled to
review a copy of OPM's retention regulations found at 5 CFR Part 351, which is also available
from your personnel office.

**EXHIBIT 4**

(D)-2

The action described above should not be considered as reflecting upon your performance or conduct. It is being taken solely for the reasons stated.

*Oswald Barsi*

Oswald Barsi
RIF Compliance Specialist, Team Leader

Enclosure
        Explanation of Benefits

cc:    Official Personnel Folder

2

INVESTIGATIVE REPORT

**EXHIBIT 4**



Northeast Area Office


**UNITED STATES**
**POSTAL SERVICE**™

May 8, 1997

MEMORANDUM FOR OLIVER STEVENSON, JR.
SENIOR MANAGER DISTRIBUTION OPERATIONS
BOSTON P&DC

SUBJECT:  Request for Information - Selection of Plant Manager, Manchester
New Hampshire

In your April 23, 1997 letter to me you listed a series of questions regarding the Lead
Plant Manager, Manchester position and its selection.  When this position first became
vacant, it was as an EAS level 25 position.  Consequently, in our letter to you, it was
stated you would be given due consideration during the selection process.

The Area Vice Presidents were given an option to change Lead Plant Manager positions
to PCES status.  Consequently, viable applicants for this position were required to be
candidates of the Corporate Succession Planning process.  As you were advised in my
April 29, 1997 memo to you, only Succession Planning candidates were considered for
the PCES vacancy.  This was reiterated to you in your telephone conversation with Lisa
Lynch, Acting Human Resources Analyst.

I hope this information is of assistance to you.

*Mary E Burrell*
Mary E. Burrell
Manager
Human Resources

cc: Kenneth Winters, with attachment
    Louis Pento, with attachment

s:public\human\stev3.doc

6 Griffin Road N
Windsor CT 06006-7000

<u>**MEMO FOR THE RECORD**</u>

(N)

MEETING - MAY 8th 1997

AT APPROXIMATELY 13:30 HOURS ON THURSDAY MAY 8th. 1997, A MEETING TOOK PLACE IN THE PLANT MANAGERS CONFERENCE ROOM REGARDING BOSTON RIF OPTIONS FOR OLIVER STEVENSON Jr.

ATTENDEES:    KEN WINTERS - LEAD PLANT MANAGER, BOSTON

DALLAS HOLT - NORTH EAST AREA HUMAN RESOURCES

LOU PENTO - HUMAN RESOURCES MANAGER, BOSTON

OLIVER STEVENSON Jr. - RIF EFFECTED MANAGER, BOSTON

THIS MEETING WAS DIRECTED TO TAKE PLACE BY MARY BURRELL, NORTH EAST AREA MANAGER HUMAN RESOURCES, AND WAS TO TRY AND RESOLVE ISSUES THAT WERE WRITTEN ABOUT IN LETTERS, BY MYSELF, OLIVER STEVENSON Jr., TO Mr. WILLIAM HENDERSON, EXECUTIVE VICE-PRESIDENT AND CHIEF OPERATING OFFICER, USPS.

AFTER REVIEWING THE BASIS, AND MY DOCUMENTATION, FOR THE ISSUES RAISED IN THE SEVERAL LETTERS, INCLUDING THOSE IN TWO OF Ms. BURRELL's LETTERS OF REBUTTAL, AND AFTER DISCUSSING THE NEED TO MOVE THE PROCESS ALONG AS THERE WAS ONLY A SHORT TIME UNTIL MAY 23rd., MY LAST DAY OF EMPLOYMENT WITH THE POSTAL SERVICE UNDER THE PROVISIONS OF THE BOSTON RIF, UNLESS A POSTION WAS OFFERED AND ACCEPTED, WE DISCUSSED WHAT PLACEMENT OPTIONS WERE AVAILABLE. FOR MYSELF, OLIVER STEVENSON Jr.

AS I HAD PLACED MYSELF IN CONTENTION FOR A POSITION AT LEHIGH VALLEY AT MY LEVEL, I ASKED THAT THE EFFORT BE MADE TO EITHER SECURE ME THIS POSITION OR THE VACANT MANAGER HUMAN RESOURCE POSITION IN HARRISBURG PA. ( DISCUSSION OCCURRED AS TO WHETHER OR NOT I MET THE REQUIREMENTS FOR THE HUMAN RESOURCE POSITION, I FELT THAT I DID, EVERYBODY ELSE AT THE MEETING FELT THAT I DID NOT.

KEN WINTERS BROUGHT UP THAT HE FELT THAT I MET THE QUALIFICATIONS FOR A LEVEL 20 POSTMASTER POSITION, AND HE ASKED ME WOULD I ACCEPT ONE IF I WAS IN THE RIGHT LOCATION. I SAID THAT I WOULD CONSIDER ALL OFFERS, INCLUDING EAS 18's & EAS 20's IF I WAS HAPPY ABOUT THEIR LOCATIONS, AND THAT I PREFERRED THE HARRISBURG AREA, IF I WAS GOING TO RELOCATE AT ALL.

I BROUGHT UP MY CONCERNS AS TO HOUSE PURCHASE, AND WAS ASSURED THAT ALL IN THE MEETING WOULD HELP ME OBTAIN A WAIVER TO HAVE THE POSTAL SERVICE OFFER ME THIS OPTION. (NOBODY MADE ANY GUARANTEES, JUST GAVE PROMISES OF ASSISTANCE)

DALLAS HOLT & LOU PENTO WERE TO MAKE A CONFERENCE CALL TO THE AREA AFTER THE MEETING TO HAVE THE AREA INQUIRE ABOUT THE PLANT MANAGER's VACANCY IN LEHIGH VALLEY, AND ALSO TO ASCERTAIN IF THERE WERE ANY SUITABLE VACANCIES IN THE HARRISBURG AREA.

I STATED AT THE CLOSE OF THE MEETING THAT I FELT WE HAD SPENT A LOT OF TIME DISCUSSING THE LOW END OF LEVELS, THE 18's & 20's, RATHER THAN THE MORE APPROPRIATE LEVELS, THE 25's & 24's. I ALSO WAS EMPHATIC TO EACH ATTENDEE THAT I WOULD ENTERTAIN ANY AND ALL OFFERS, EXCEPTION BEING SDO OFFERS, BUT THAT NOBODY WAS TO MAKE ANY COMMITMENTS FOR ME BY ACCEPTING ANY POSITION, ANYWHERE.

AS A MEMO FOR THE RECORD.

OLIVER STEVENSON Jr.
MAY 13, 1997

```
Author:  OLIVER STEVENSON at BOMA001L
Date:    5/13/97  2:04 PM
Priority: Urgent
Receipt Requested
  : Kenneth F Winters
TO: DALLAS X HOLT at POME001L
TO: LOUIS M PENTO
Subject: RIF OUTPLACEMENT EFFORTS
```

(0) - 1

-------------------------------- Message Contents ------------------------------------

GENTLEMEN;

I WOULD LIKE TO THANK YOU FOR YOUR TIME AND EFFORTS TO SECURE

ME A POSITION IN PENNSYLVANIA, BUT AS WE DISCUSSED, I FEEL THAT

MY ACCEPTANCE OF A LEVEL 18 POSTMASTER POSITION, SUCH AS WAS MY ONLY

OFFER, WOULD NOT REFLECT A PROPER UTILIZATION OF MY MANY YEARS OF

EXPERIENCE AS A SENIOR POSTAL MANAGER.


AS I STATED AT OUR MAY 8 MEETING, I WILL BE OPEN TO ALL OFFERS

OF POSITIONS, BUT MY PREFERENCE IS TO STAY WITHIN ONE OR TWO LEVELS

OF MY PRESENT LEVEL, ANYWHERE IN THE COUNTRY. IF I CAN DO THIS, I

BELIEVE THAT I CAN CONTINUE TO CONTRIBUTE SO MUCH MORE BACK TO THE

COMPANY, AND AT THE SAME TIME, I COULD MAINTAIN A SOLID SENSE OF SELF

WORTH AND SELF FULFILLMENT


I KNOW THAT THERE ARE SOME VACANT POSITIONS THAT MEET THE LEVEL

PREFERENCE, THERE ARE TWO SUCH POSITIONS IN MY PREFERRED LOCATION,

THE HARRISBURG PA. AREA. THESE ARE THE PLANT MANAGER LEHIGH VALLEY

AND THE MANAGER HUMAN RESOURCES FOR THE HARRISBURG DISTRICT. I FEEL

THAT I AM QUALIFIED FOR EITHER OF THESE POSITIONS AS I STATED AT THE

MAY 8 MEETING.


DALLAS/LOU, AS YOU MENTIONED THAT I WAS TO BE PART OF THE PACKAGE

FOR THE PLANT MANAGER'S VACANCY AT LEHIGH VALLEY, MIGHT I SUGGEST THAT

THE SELECTING OFFICIAL BE CONTACTED TO ARRANGE AN EARLY INTERVIEW,

MAYBE AT THAT TIME I COULD ALSO RECEIVE AN INTERVIEW FOR THE MANAGER,



(M)


**UNITED STATES**
**POSTAL SERVICE** ™

May 7, 1997


MEMORANDUM FOR OLIVER STEVENSON, JR.
SENIOR MANAGER DISTRIBUTION OPERATIONS
BOSTON P&DC


SUBJECT:   Boston P&DC Reduction in Force (RIF)


I have reviewed your response dated May 4, 1997, to my letter of April 29, 1997.
I have asked Dallas Holt to set up a meeting with you, Ken Winters, Lou Pento,
and himself on Thursday, May 8, 1997, so you can personally address your
concerns about placement opportunities.  If there are any other vacancies that
you would like assistance in placement, please let them know in your meeting.


*Mary E Burrell*

Mary E. Burrell
Manager
Human Resources


cc:  Kenneth Winters
     Lou Pento

dh_stev3.doc





NORTHEAST AREA OFFICE

 **UNITED STATES POSTAL SERVICE™**

(ATTACHMENT - #1)

May 23, 1997

MEMORANDUM FOR OLIVER STEVENSON, JR.
                           SENIOR MANAGER DISTRIBUTION OPERATIONS
                           BOSTON P&DC

SUBJECT:  Voluntary Placement - Postmaster, Fayetteville, PA, EAS-18

Your request dated May 20, 1997, for noncompetitive placement to the position of Postmaster, Fayetteville, PA, EAS-18, has been approved.  We have coordinated this placement with the Harrisburg District, Headquarters' RIF Group, and Boston District.  The effective date will be May 24, 1997, with the reporting date, as you requested, of Monday, July 7, 1997.  You will be provided with a protected salary for two years from the effective date.

Your new manager is Ronald Hamen, Manager, Post Office Operations, Harrisburg District.  You are to report to him on July 7, 1997, at the below address:

           Harrisburg District Office, Room 215
           1425 Crooked Hill Road
           Harrisburg, PA  17107-9202

You should also contact Mr. Hamen at (717) 257-4824, upon receipt of this letter to coordinate the necessary training to begin after your reporting date.

The Northeast Area will be responsible for the relocation expenses.  You have requested the option to apply for a housing purchase exception under the relocation procedures.  As a deviation request will be necessary, please submit this request to me to coordinate with Finance.

*Mary E Burrell*

Mary E. Burrell
Manager
Human Resources

cc:  Ronald Hamen, Manager, Post Office Operations, Harrisburg District
      Kenneth Winters, Lead Plant Manager, Boston P&DC
      Lou Pento, Manager, Human Resources, Boston District
      Michael Dean, A/Manager, Human Resources, Harrisburg District
      Ozwald Barsi, RIF Compliance Specialist, Team Leader

(8)

 **UNITED STATES
POSTAL SERVICE**

May 20, 1997

Mary E. Burrell
Manager, Human Resources
Northeast Area
6 Griffin Road North
Windsor CT 06006-7050

This is a formal request for noncompetitive consideration for the position of Postmaster, Level 18, at Fayetteville PA, which I understand would be with two years protected salary. I also understand, if selected, normal relocation expenses and reimbursements would be provided to me.

It is further understood, if selected for the foregoing position, I will have the option to apply for a housing purchase exception under the relocation procedures which, if granted, will resolve all issues; i.e., EEO, or any other avenues.

Oliver Stevenson
Manager, Distribution Operations
Boston Processing & Distribution Center

INVESTIGATIVE REPORT                    **Affidavit A**



To: Mr. Jon M. Steele                          Date: December 17, 1996
    Vice-President, Northeast Area Operations
    USPS 6 Griffin Road North
    Windsor CT.  06006-7010                          (C)

From: Oliver Stevenson Jr.
    Senior Manager, Distribution Operations
    GMF Boston MA. 02205-9703

    Mr. Steele;

    I ask that you consider me for a lateral appointment to the soon to be vacant position of Plant Manager, Manchester New Hampshire.

    I am at present serving on the tail end of a long term detail as the Post Office Activation Coordinator for the Northwest Boston Processing and Distribution Center in Waltham Massachusetts. The building of this Center, with its attendant shift of volumes and personnel from GMF Boston, has caused Senior Boston management to revise the present Boston Mail Processing management levels. As a result, I was informed that I am to be part of a planned Reduction-In-Force procedure for Boston SMDOs and MDOs.

    For your review in this matter, I have attached a completed 991, utilizing the position requirements from another Plant Manager vacancy, (Roanoke Virginia), which is the same level as the Plant Manager, Manchester New Hampshire.

    I believe that I have the knowledge, skills and the abilities that would allow me to continue Manchester's already proven service track record. I further believe that because of the detail that I am presently on, I have developed a real skill in identifying with, and working with, the public. By gaining this experience, I feel that I am better able to build, and to foster, more productive relations between neighborhoods, communities, and the Postal Service.

    I ask that you give my request your full consideration.

    I am available, at your convenience, if there are any questions that you might have of me in this matter.

    Thank you,

Oliver Stevenson Jr.

    (attachments)

cc: Deborah S. Albert, District Manager, Boston
    Kenneth Winters, Plant Manager, Boston
    Frank Manganaro, Plant Manager, Northwest Boston

Affidavit A



NORTHEAST AREA OFFICE




UNITED STATES
POSTAL SERVICE™

January 14, 1997

Oliver Stevenson, Jr.
137 Sunview Condo
Derry, NH 03038-1553

Dear Mr. Stevenson:

Your request to Jon Steele for consideration for a lateral assignment to the EAS-25,

Manager, Processing and Distribution, position in Manchester, New Hampshire was

referred to me for response.  This position has recently become vacant and we will keep

your request on file for consideration when a decision has been made to fill this position

in accordance with standard procedures.

Sincerely,

Mary E. Burrell
Manager
Human Resources

cc:     Deborah S. Albert
        Kenneth Winters

s\public\human\aa_bos.doc

6 GRIFFIN ROAD N
WINDSOR CT 06006-7000

INVESTIGATIVE REPORT
PAGE 125

**Affidavit A**



NORTHEAST AREA OFFICE



**UNITED STATES**
**POSTAL SERVICE™**

APR 15 1997
TRANS. & N... TWORKS
BOSTON MA
02205-9726

April 14, 1997

MEMORANDUM FOR OLIVER STEVENSON, JR
                SENIOR MANAGER DISTRIBUTION OPERATIONS
                BOSTON P&DC

SUBJECT: PCES Selection - - Manchester P&DC

Headquarters has approved several options in the method for staffing certain Lead Plant Manager positions. At the discretion of the Area Vice President and based on the business environment, an EAS-25 Lead Plant Manager positions may be filled as either EAS or PCES. In the case of the Manchester P&DC, a decision has been made to fill the position as PCES via the current PCES selection procedures. Since you have not been identified as a potential successor through the Corporate Succession Planning process, you were not eligible to compete for this position. I would however like to take this opportunity to thank you for your interest in the Plant Manager, Manchester P&DC vacancy.

Barry L. Moore, Plant Manager, Utica P&DF has been selected for reassignment to this position.

If you have any questions pertaining to this matter, I suggest that you contact your Executive Manager or, for information pertaining to the PCES selection procedure, contact Scott P. Morgan, Human Resources Analyst, at (860)285-7017.

Again, thank you for your interest and gook luck in your future endeavors.

*Mary E Burrell*

Mary E. Burrell
Manager, Human Resources

cc:    Kenneth Winters
       Vacancy File

6 GRIFFIN ROAD N
WINDSOR CT 06006-7000

INVESTIGATIVE REPORT

Affidavit A



CORPORATE PERSONNEL OPERATIONS

RECEIVED
VICE PRESIDENT

**UNITED STATES**
**POSTAL SERVICE**

| Human Resources | | |
|---|---|---|
| Northeast Area | | |
| Date: 6/13 | Source: HQ/ATL | |
| | Action | Info |
| Mgr. HR | | ✓ |
| Labor Rel | | ✓ |
| D Holt | | ✓ |
| S Morgan | | ✓ |
| K Anderson | | |
| HRA Safety | | |
| HRA Inj Comp | | |
| Dr. Duval | | |
| Appeals/EEO | | |
| Lisa Lynch | | |
| Diversity | | |
| D Donneth | | |
| HR (Dist) | | |
| O | | |
| | | |

| NORTHEAST AREA | | |
|---|---|---|
| VICE PRESIDENT AREA OPERATIONS | ACTION | INFO |
| OPERATIONS SUPPORT | | |
| ERY | | |
| ANT SUPPORT | | |
| HUMAN RESOURCES | | ✓ |
| FINANCE | | |
| CUSTOMER SERVICE | | |
| SALES | | |
| QUALITY | | |
| DISTRIBUTION LIST | | |
| PENDING DATE | | |
| COMMENTS | | |

June 12, 1997

VICE PRESIDENTS, AREA OPERATIONS

SUBJECT: New Successor Pool – Manager, Processing and Distribution 4

With the conversion of several plants from EAS to PCES, we have established a new level of plant pool—Manager, Processing and Distribution 4. As you know, the level of responsibility and the compensation structure of this position differs greatly from that of the Manager, Processing and Distribution 3. In order to identify and develop individuals for selection as a Manager, Processing and Distribution 4, you should begin to seek individuals for this pool that have the leadership ability, level of expertise, and proven track record to perform successfully in an executive position.

My staff will brief your liaisons on this information. If you have any questions regarding the Manager, Processing and Distribution 4 pool, please feel free to call me at 202-268-3643.

Stephen A. Leavey
Manager

cc: Mr. Coughlin
    Mr. Henderson
    Mr. Maddern

475 L'ENFANT PLAZA SW, ROOM 1813
WASHINGTON DC 20260-4261

INVESTIGATIVE REPORT

**EXHIBIT 8**

# PROCESSING AND DISTRIBUTION CENTERS HEADED BY PCES MANAGERS

## CATEGORY 1 PLANTS

Atlanta P&D Center
Baltimore P&D Center
Boston P&D Center
Chicago P&D Center
Cleveland P&D Center
Dallas P&D Center
Denver P&D Center
Detroit P&D Center
Houston P&D Center
JFK Airport Mail Center
Los Angeles P&D Center
Miami P&D Center
New Jersey BMC
Oakland P&D Center
Philadelphia P&D Center
Phoenix P&D Center
Pittsburgh P&D Center
San Francisco P&D Center
Seattle P&D Center
St. Louis P&D Center
Washington DC P&D Center
Western Nassau P&D Center

## CATEGORY 2 PLANTS

Birmingham P&D Center
Brooklyn P&D Center
Buffalo P&D Center
Carol Stream P&D Center
Charlotte P&D Center
Chicago BMC
Cincinnati P&D Center
Columbus P&D Center
Dallas BMC
Des Moines P&D Center
Dominic V. Daniels NJ P&D Center
Ft. Worth P&D Center
Greensboro P&D Center
Hartford P&D Center
Honolulu P&D Center
Indianapolis P&D Center
Irving Park Road P&D Center
Jacksonville P&D Center
Kansas City MO P&D Center
Louisville P&D Center
Margaret L. Sellers P&D Center
Memphis P&D Center
CATEGORY 2 PLANTS (cont.)

Mid-Island P&D Center
Milwaukee P&D Center
Minneapolis P&D Center
Nashville P&D Center
New Haven P&D Center
New Orleans P&D Center
New York GPO P&D Center
New York Morgan P&D Center
Newark P&D Center
Northern Virginia P&D Center
Oklahoma City P&D Center
Orlando P&D Center
Philadelphia BMC
Portland OR P&D Center
Providence P&D Center
Queens P&D Center
Richmond P&D Center
Royal Oak P&D Center
Sacramento P&D Center
Salt Lake City P&D Center
San Antonio P&D Center
Santa Ana P&D Center

**EXHIBIT 8**

SOURCE: ORGANIZATIONAL STRUCTURE
AND JOB EVALUATION 10/93
Revised 12/95
2nd Revision 6/97

## PROCESSING AND DISTRIBUTION CENTERS HEADED BY PCES MANAGERS

South Jersey P&D Center
South Suburban P&D Center
Springfield MA P&D Center
St. Paul P&D Center
Tampa P&D Center
Van Nuys P&D Center
Worldway Airport Mail Center

### CATEGORY 3 PLANTS

Albany P&D Center
Atlanta BMC
Cincinnati BMC
Denver BMC
Des Moines BMC
Detroit BMC
Ft. Lauderdale P&D Center
Greensboro BMC
Harrisburg P&D Center
Industry CA P&D Center
Inglewood P&D Center
Jacksonville BMC
Kansas City KS P&D Center
Las Vegas P&D Center
Little Rock P&D Center
Long Beach P&D Center
Los Angeles BMC
Memphis BMC
Minneapolis/St. Paul BMC
North Houston P&D Center
North Metro (GA) P&D Center
North Texas P&D Center
O'Hare Airport Mail Center
Omaha P&D Center
Palatine P&D Center
Pittsburgh BMC

San Bernardino P&D Center
San Francisco BMC
San Jose P&D Center
Seattle BMC
Southeast PA P&D Center
St. Louis BMC
Tulsa P&D Center
West Palm Beach P&D Center
Westchester P&D Center
Wilmington P&D Center

### CATEGORY 4 PLANTS
(approved for PCES Mgr at discretion of AVP)

Akron P&D Center
Albuquerque P&D Center
Anchorage P&D Center
Charleston WV P&D Center
Columbia P&D Center
Grand Rapids P&D Center
Jackson P&D Center

Macon P&D Center
→ Manchester P&D Center ←
Middlesex-Essex P&D Center
Portland ME P&D Center
Spokane P&D Center

**EXHIBIT 8**

SOURCE: ORGANIZATIONAL STRUCTURE
AND JOB EVALUATION 10/93
Revised 12/96
2nd Revision 6/97

INVESTIGATIVE REPORT



HUMAN RESOURCES

(9)-2


**UNITED STATES POSTAL SERVICE.**

4/17/97

Oliver Stevenson, Jr.
5 Tsienneto Road, # 137
Derry, NH  03038-1553

Dear Mr. Stevenson:

This will confirm my verbal offer of the position of
_MDO_____, EAS-20.  The position is located at the
_PMF_____.  If you accept the offer, the effective date of this
assignment will be _MAY 24, 1997_____.  Please indicate your acceptance
of this offer by signing and dating below and return the letter to me in
the envelope provided.

Because you are currently assigned to a facility which is undergoing a
Reduction in Force (RIF), you should understand that if you accept this
offer, your grade will be immediately reduced to EAS-   upon assignment
to the position.  Further, if your current salary is above the maximum
of the lower grade level, you will receive salary retention for a period
not to exceed two years.  At the end of the two-year period, your salary
will be reduced to the maximum of the lower grade, or will remain at
your retained salary, whichever is lower.

Yours truly,

Kenneth F. Winters
Manager, Processing & Distribution


I accept the position under the terms outlined above.  Further, I accept
this position free of any coercion or duress.


_____           _____
(Name)                            (Date


25 DORCHESTER AVE
BOSTON MA 02205-9994

INVESTIGATIVE REPORT

**EXHIBIT 5**



CORPORATE PERSONNEL OPERATIONS

**UNITED STATES
POSTAL SERVICE**

| Human Resources Northeast Area | | |
|---|---|---|
| Date: 21.28 | Source: | |
| | Action | Info |
| Mgr HR | | ✓ |
| Labor Rel | | |
| D Holt | | ✓ |
| S Morgan | | |
| A Anderson | | ✓ |
| HRA Safety | | |
| HRA Inj Comp | | |
| Dr. Duval | | |
| Appeals/EEO | | |
| Lisa Lynch | | |
| Diversity | | |
| D Connolly | | |

RECEIVED
FEB 27 1997
By _____

February 24, 1997

ALL OFFICERS

SUBJECT: Revised PCES Selection Procedures

Attached are the revised PCES Selection Procedures which are to be referenced when filling
executive vacancies.  The revisions that are reflected in this document include new and/or
updated information regarding the following issues:

- Succession planning,
- Executive assessment,
- Executive compensation, and
- Reassignment Lump-Sum policies.

If you have any questions or need additional information, I can be reached at 202-268-3643.

Stephen A. Leavey
Manager

Attachment

| NORTHEAST AREA RESIDENT AREA OPERATIONS | ACTION | INFO |
|---|---|---|
| OPERATIONS SUPPORT | | |
| DELIVERY | | |
| IN PLANT SUPPORT | | ✓ |
| DNO | | |
| HUMAN RESOURCES | | ✓ |
| FINANCE | | ✓ |
| CUSTOMER SERVICE | | |
| SALES | | |
| QUALITY | | |
| DISTRIBUTION LIST | | |
| PENDING DATE | | |
| COMMENTS | | |

INVESTIGATIVE REPORT

**EXHIBIT 9**

13

NORTHEAST AREA SUCCESSION PLAN
FIELD EXECUTIVE POSITIONS
Updated 03/10/97

CONFIDENTIAL

| DM1 | BM2/3 | POESPM | BMC1/2/3 | P&D1 | P&D2/3 | METRO AREA |
|---|---|---|---|---|---|---|
| | | | | | R. Bryant (2) | N/A |
| | | | | | G. DiFiore (3) | |
| | | | | | D. Donnelly (3) | |
| | | | | | J. Gale (3) | |
| | | | | | W. Hoppock (2) | |
| | | | | | N. Hughes (3) | |
| | | | | | D. Kenyon | |
| | | | | | G. Kothman (2) | |
| | | | | | S. Lacey (2) | |
| | | | | | D. Maselli (3) | |
| | | | | | B. Moore (3) | |
| | | | | | B. Walsh | |
| | | | | | D. Wnuk (3) | |

A:\CSP\FLDEXEC2.doc

INVESTIGATIVE REPORT

EXHIBIT 10





NORTHEAST AREA OFFICE

(H)


**UNITED STATES**
**POSTAL SERVICE**™

May 8, 1997

MEMORANDUM FOR OLIVER STEVENSON, JR.
             SENIOR MANAGER DISTRIBUTION OPERATIONS
             BOSTON P&DC

SUBJECT:  Request for Information - Selection of Plant Manager, Manchester
          New Hampshire

In your April 23, 1997 letter to me you listed a series of questions regarding the Lead
Plant Manager, Manchester position and its selection.  When this position first became
vacant, it was as an EAS level 25 position.  Consequently, in our letter to you, it was
stated you would be given due consideration during the selection process.

The Area Vice Presidents were given an option to change Lead Plant Manager positions
to PCES status.  Consequently, viable applicants for this position were required to be
candidates of the Corporate Succession Planning process.  As you were advised in my
April 29, 1997 memo to you, only Succession Planning candidates were considered for
the PCES vacancy.  This was reiterated to you in your telephone conversation with Lisa
Lynch, Acting Human Resources Analyst.

I hope this information is of assistance to you.

*Mary E. Burrell*
Mary E. Burrell
Manager
Human Resources

cc: Kenneth Winters, with attachment
    Louis Pento, with attachment

s:public\human\stev3.doc

6 GRIFFIN ROAD N
WINDSOR CT 06006-7000

INVESTIGATIVE REPORT          **EXHIBIT 13**

15

**Attachment 5**

PART 351. REDUCTION IN FORCE
Authority: 5 U.S.C. 1302, 3502, 3503; S351.801 also issued under E.O. 12828, 58 FR 2965.
Source: 33 FR 12429, Sept. 4, 1968; 46 FR 3805, Jan. 16, 1981; 48 FR 49464, Oct. 25, 1983; 50
FR 35488, Aug. 30, 1985; 51 FR 319, Jan. 3, 1986; 52 FR 10024, March 30, 1987; 53 FR 45068,
Nov. 8, 1988; 58 FR 32047, June 8, 1993; 60 FR 2678, Jan. 11, 1995, unless otherwise noted.
SUBPART A. [RESERVED]
SUBPART B. GENERAL PROVISIONS
Source: 51 FR 320, Jan. 3, 1986, unless otherwise noted.
§ 351.201 Use of regulations.
(a)(1) Each agency is responsible for determining the categories within which positions are
required, where they are to be located, and when they are to be filled, abolished, or vacated.
This includes determining when there is a surplus of employees at a particular location in a
particular line of work.
(2) Each agency shall follow this part when it releases a competing employee from his or her
competitive level by furlough for more than 30 days, separation, demotion, or reassignment
requiring displacement, when the release is required because of lack of work; shortage of funds;
insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration
rights; or reclassification of an employee's position die to erosion of duties when such action will
take effect after an agency has formally announced a reduction in force in the employee's
competitive area and when the reduction in force will take effect within 180 days.
(b) This part does not require an agency to fill a vacant position. However, when an agency, at
its discretion, chooses to fill a vacancy by an employee who has been reached for release from a
competitive level for one of the reasons in paragraph (a)(2) of this section, this part shall be
followed.
(c) Each agency is responsible for assuring that the provisions in this part are uniformly and
consistently applied in any one reduction in force.
(d) An agency authorized to administer foreign national employee programs under section 408 of
the Foreign Service Act of 1980 (22 U.S.C. 3968) may include special plans for reduction in force
in its foreign national employee programs. In these special plans an agency may give effect to
the labor laws and practices of the locality of employment by supplementing the selection factors
in Subparts D and E of this part to the extent consistent with the public interest. Subpart I of this
part does not apply to actions taken under the special plans authorized by this paragraph.
§ 351.202 Coverage.
(a) Employees covered. Except as provided in paragraph (b) of this section, this part applies to
each civilian employee in:
(1) The executive branch of the Federal Government; and
(2) Those parts of the Federal Government outside the executive branch which are subject by
statute to competitive service requirements or are determined by the appropriate legislative or
judicial administrative body to be covered hereunder. Coverage includes administrative law
judges except as modified by Part 930 of this chapter.
(b) Employees excluded. This part does not apply to an employee:
(1) In a position in the Senior Executive Service; or
(2) Whose appointment is required by Congress to be confirmed by, or made with the advice and
consent of, the United States Senate, except a postmaster.
(c) Actions excluded. This part does not apply to:
(1) The termination of a temporary or term promotion or the return of an employee to the position
held before the temporary or term promotion or to one of equivalent grade and pay.
(2) A change to lower grade based on the reclassification of an employee's position due to the
application of new classification standards or the correction of a classification error.
(3) A change to lower grade based on reclassification of an employee's position due to erosion of
duties, except that this exclusion does not apply to such reclassification actions that will take
effect after an agency has formally announced a reduction in force in the employee's competitive
area and when the reduction in force will take effect within 180 days. This exception ends at the
completion of the reduction in force.
(4) The change of an employee from regular to substitute in the same pay level in the U.S. Postal
Service field service.

1

EXHIBIT 2

Attachment 5

(5) The release from a competitive level of a National Guard technician under section 709 of title 32, United States Code.
(6) Placement of an employee serving on an intermittent, part-time, on-call, or seasonal basis in a nonpay and nonduty status in accordance with conditions established at time of appointment.
(7) A change in an employee's work schedule from other-than-full-time to full-time. (A change from full-time to other than full-time for a reason covered in § 351.201(A)(2) is covered by this part.)
[60 FR 3062, Jan. 13, 1995]
§ 351.203 Definitions.
In this part:
"Competing employee" means an employee in tenure group I, II, or III.
"Current rating of record" is the rating of record for the most recently completed appraisal period as provided in § 351.504(b)(3).
"Days" means calendar days.
"Function" means all or a clearly identifiable segment of an agency's mission (including all integral parts of that mission), regardless of how it is performed.
"Furlough" under this part means the placement of an employee in a temporary nonduty and nonpay status for more than 30 consecutive calendar days, or more than 22 workdays if done on a discontinuous basis, but not more than 1 year.
"Local commuting area" means the geographic area that usually constitutes one area for employment purposes. It includes any population center (or two or more neighboring ones) and the surrounding localities in which people live and can reasonably be expected to travel back and forth daily to their usual employment.
"Modal rating" is the summary rating level assigned most frequently among the actual ratings of record that are:
(1) Assigned under the summary level pattern that applies to the employee's position of record on the date of the reduction in force;
(2) Given within the same competitive area, or at the agency's option within a larger subdivision of the agency or agencywide; and
(3) On record for the most recently completed appraisal period prior to the date of issuance of reduction in force notices or the cutoff date the agency specifies prior to the issuance of reduction in force notices after which no new ratings will be put on record.
"Rating of record" has the meaning given that term in § 430.203 of this chapter. For an employee not subject to 5 U.S.C. Chapter 43, or part 430 of this chapter, it means the officially designated performance rating, as provided for in the agency's appraisal system, that is considered to be an equivalent rating of record under the provisions of § 430.201(c) of this chapter.
"Reorganization" means the planned elimination, addition, or redistribution of functions or duties in an organization.
"Representative rate" means the fourth step of the grade for a position subject to the General Schedule, the prevailing rate for a position under a wage-board or similar wage-determining procedure, and for other positions, the rate designated by the agency as representative of the position.
"Transfer of function" means the transfer of the performance of a continuing function from one competitive area and its addition to one or more other competitive areas, except when the function involved is virtually identical to functions already being performed in the other competitive area(s) affected; or the movement of the competitive area in which the function is performed to another commuting area.
"Undue interruption" means a degree of interruption that would prevent the completion of required work by the employee 90 days after the employee has been placed in a different position under this part. The 90-day standard should be considered within the allowable limits of time and quality, taking into account the pressures of priorities, deadlines, and other demands. However, a work program would generally not be unduly interrupted even if an employee needed more than 90 days after the reduction in force to perform the optimum quality or quantity of work. The 90-day standard may be extended if placement is made under this part to a low priority program or to a vacant position.

2

EXHIBIT 2

**Attachment 5**

[58 FR 65533, Dec. 15, 1993; 59 FR 40792, Aug. 10, 1994; 60 FR 3062, Jan. 13, 1995; 62 FR 62500, Nov. 24, 1997]

§ 351.204 Responsibility of agency.

Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction force is necessary.

§ 351.205 Authority of OPM.

The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force through the Federal Personnel Manual system. OPM may examine an agency's preparations for reduction in force at any stage. When OPM finds that an agency's preparations are contrary to the express provisions or to the spirit and intent of these regulations or that they would result in violation of employee rights or equities, OPM may require appropriate corrective action.

SUBPART C. TRANSFER OF FUNCTION

SOURCE: 52 FR 10024, March 30, 1987, unless otherwise noted.

§ 351.301 Applicability.

(a) This subpart is applicable when the work of one or more employees is moved from one competitive area to another as a transfer of function regardless of whether or not the movement is made under authority of a statute, Executive order, reorganization plan, or other authority.

(b) In a transfer of function, the function must cease in the losing competitive area and continue in an identical form in the gaining competitive area (i.e., in the gaining competitive area, the function continues to be carried out by competing employees rather than by noncompeting employees).

[60 FR 3062, Jan. 13, 1995]

§ 351.302 Transfer of employees.

(a) Before a reduction in force is made in connection with the transfer of any or all of the functions of a competitive area to another continuing competitive area, each competing employee in a position identified with the transferring function or functions shall be transferred to the continuing competitive area without any change in the tenure of his or her employment.

(b) An employee whose position is transferred under this subpart solely for liquidation, and who is not identified with an operating function specifically authorized at the time of transfer to continue in operation more than 60 days, is not a competing employee for other positions in the competitive area gaining the function.

(c) Regardless of an employee's personal preference, an employee has no right to transfer with his or her function, unless the alternative in the competitive area losing the function is separation or demotion.

(d) Except as permitted in paragraph (e) of this section, the losing competitive area must use the adverse action procedures found in 5 CFR Part 752 if it chooses to separate an employee who declines to transfer with his or her function.

(e) The losing competitive area may, at its discretion, include employees who decline to transfer with their function as part of a concurrent reduction in force.

(f) An agency may not separate an employee who declines to transfer with the function any sooner than it transfers employees who chose to transfer with the function to the gaining competitive area.

(g) Agencies may ask employees in a canvass letter whether the employee wishes to transfer with the function when the function transfers to a different local commuting area. The canvass letter must give the employee information concerning entitlements available to the employee if the employee accepts the offer to transfer, and if the employee declines the offer to transfer. An employee may later change and initial acceptance offer without penalty. However, an employee may not later change an initial declination of the offer to transfer.

[60 FR 3062, Jan. 13, 1995]

§ 351.303 Identification of positions with a transferring function.

(a) The competitive area losing the function is responsible for identifying the positions of competing employees with the transferring function. A competing employee is identified with the transferring function on the basis of the employee's official position. Two methods are provided to identify employees with the transferring function:

(1) Identification Method One; and

(2) Identification Method Two.

3

EXHIBIT 2

Attachment 5

(b) Identification Method One must be used to identify each position to which it is applicable. Identification Method Two is used only to identify positions to which Identification Method One is not applicable.

(c) Under Identification Method One, a competing employee is identified with a transferring function if.

(1) The employee performs the function during at least half of his or her work time; or

(2) Regardless of the amount of time the employee performs the function during his or her work time, the function performed by the employee includes the duties controlling his or her grade or rate of pay.

(3) In determining what percentage of time an employee performs a function in the employee's official position, the agency may supplement the employee's official position description by the use of appropriate records (e.g., work reports, organizational time logs, work schedules, etc.).

(d) Identification Method Two is applicable to employees who perform the function during less than half of their work time and are not otherwise covered by Identification Method One. Under Identification Method Two, the losing competitive area must identify the number of positions it needed to perform the transferring function. To determine which employees are identified for transfer, the losing competitive area must establish a retention register in accordance with this part that includes the name of each competing employee who performed the function. Competing employees listed on the retention register are identified for transfer in the inverse order of their retention standing. If for any retention register this procedure would result in the separation or demotion by reduction in force at the losing competitive area of any employee with higher retention standing, the losing competitive area must identify competing employees on that register for transfer in the order of their retention standing.

(e)(1) The competitive area losing the function may permit other employees to volunteer for transfer with the function in place of employees identified under Identification Method One or Identification Method Two. However, the competitive area may permit these other employees to volunteer for transfer only if no competing employee who is identified for transfer under Identification Method One or Identification Method Two is separated or demoted solely because a volunteer transferred in place of him or her to the competitive area that is gaining the function.

(2) If the total number of employees who volunteer for transfer exceeds the total number of employees required to perform the function in the competitive area that is gaining the function, the losing competitive area may give preference to the volunteers with the highest retention standing, or make selections based on other appropriate criteria.

[60 FR 3062, Jan. 13, 1995]

SUBPART D. SCOPE OF COMPETITION

Source: 51 FR 321, Jan. 3, 1986, unless otherwise noted.

§ 351.401 Determining retention standing.

Each agency shall determine the retention standing of each competing employee on the basis of the factors in this subpart and in Subpart E of this part.

§ 351.402 Competitive area.

(a) Each agency shall establish competitive areas in which employees compete for retention under this part.

(b) A competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location, and it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area.

(c) When a competitive area will be in effect less than 90 days prior to the effective date of a reduction in force, a description of the competitive area shall be submitted to the OPM for approval in advance of the reduction in force. Descriptions of all competitive areas must be made readily available for review.

(d) Each agency shall establish a separate competitive area for each Inspector General activity established under authority of the Inspector General Act of 1978, Public Law 95-452, as amended, in which only employees of that office shall compete for retention under this part.

[56 FR 65416, Dec. 17, 1991; 62 FR 62500, Nov. 24, 1997]

§ 351 403 Competitive level.

4

EXHIBIT 2

**Attachment 5**

(a)(1) Each agency shall establish competitive levels consisting of all positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption.

(2) Competitive level determinations are based on each employee's official position, not the employee's personal qualifications.

(3) Sex may not be the basis for a competitive level determination, except for a position OPM designates that certification of eligibles by sex is justified.

(4) A probationary period required by subpart I of part 315 of this chapter for initial appointment to a supervisory or managerial position is not a basis for establishing a separate competitive level.

(b) Each agency shall establish separate competitive levels according to the following categories:

(1) By service.   Separate levels shall be established for positions in the competitive service and in the excepted service.

(2) By appointment authority.   Separate levels shall be established for excepted service positions filled under different appointment authorities.

(3) By pay schedule.   Separate levels shall be established for positions under different pay schedules.

(4) By work schedule.   Separate levels shall be established for positions filled on a full-time, part-time, intermittent, seasonal, or on-call basis.   No distinction may be made among employees in the competitive level on the basis of the number of hours or weeks scheduled to be worked.

(5) By trainee status.   Separate levels shall be established for positions filled by an employee in a formally designated trainee or developmental program having all of the characteristics covered in § 351.702(e)(1) through (e)(4) of this part.

(c) An agency may not establish a competitive level based solely upon:

(1) A difference in the number of hours or weeks scheduled to be worked by other-than-full-time employees who would otherwise be in the same competitive level;

(2) A requirement to work changing shifts;

(3) The grade promotion potential of the position; or

(4) A difference in the local wage areas in which wage grade positions are located.

[60 FR 3062, Jan. 13, 1995; 62 FR 62500, Nov. 24, 1997]

§ 351.404 Retention register.

(a) When a competing employee is to be released from a competitive level under this part, the agency shall establish a separate retention register for that competitive level.   The retention register is prepared from the current retention records of employees.   Upon displacing another employee under this part, an employee retains the same status and tenure in the new position. Except for an employee on military duty with a restoration right, the agency shall enter on the retention register, in the order of retention standing, the name of each competing employee who is:

(1) In the competitive level;

(2) Temporarily promoted from the competitive level by temporary or term promotion; or

(3) Detailed from the competitive level under 5 U.S.C. 3341 or other appropriate authority.

(b)(1) The name of each employee serving under a time limited appointment or promotion to a position in a competitive level shall be entered on a list apart from the retention register for that competitive level, along with the expiration date of the action.

(2) The agency shall list, at the bottom of the list prepared under paragraph (b)(1) of this section, the name of each employee in the competitive level with a written decision of removal under part 432 or 752 of this chapter.

[62 FR 62500, Nov. 24, 1997]

§ 351.405 Demoted employees.

An employee who has received a written decision under part 432 or 752 of this chapter to demote him or her competes under this part from the position to which he or she will be or has been demoted.

[62 FR 62500, Nov. 24, 1997]

SUBPART E. RETENTION STANDING

Source: 51 FR 322, Jan. 3, 1986, unless otherwise noted.

**Attachment 5**

§ 351.501 Order of retention. competitive service.
(a) Competing employees shall be classified on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as follows:
(1) By tenure group I, group II, group III; and
(2) Within each group by veteran preference subgroup AD, subgroup A, subgroup B; and
(3) Within each subgroup by years of service as augmented by credit for performance under § 351.504, beginning with the earliest service date.
(b) Groups are defined as follows:
(1) Group I includes each career employee who is not serving a probationary period. (A supervisory or managerial employee serving a probationary period required by subpart I of part 315 of this title is in group I if the employee is otherwise eligible to be included in this group.) The following employees are in group I as soon as the employee completes any required probationary period for initial appointment:
(i) An employee for whom substantial evidence exists of eligibility to immediately acquire status and career tenure, and whose case is pending final resolution by OPM (including cases under Executive Order 10826 to correct certain administrative errors);
(ii) An employee who acquires competitive status and satisfies the service requirement for career tenure when the employee's position is brought into the competitive service;
(iii) An administrative law judge;
(iv) An employee appointed under 5 U.S.C. 3104, which provides for the employment of specially qualified scientific or professional personnel, or a similar authority; and
(v) An employee who acquires status under 5 U.S.C. 3304(c) on transfer to the competitive service from the legislative or judicial branches of the Federal Government.
(2) Group II includes each career-conditional employee, and each employee serving a probationary period under subpart H of part 315 of this chapter. (A supervisory or managerial employee serving a probationary period required by subpart I of part 315 of this title is in group II if the employee has not completed a probationary period under subpart H of part 315 of this title.) Group II also includes an employee when substantial evidence exists of the employee's eligibility to immediately acquire status and career-conditional tenure, and the employee's case is pending final resolution by OPM (including cases under Executive Order 10826 to correct certain administrative errors).
(3) Group III includes all employees serving under indefinite appointments, temporary appointments pending establishment of a register, status quo appointments, term appointments, and any other nonstatus nontemporary appointments which meet the definition of provisional appointments contained in §§ 316.401 and 316.403 of this chapter.
(c) Subgroups are defined as follows:
(1) Subgroup AD includes each preference eligible employee who has a compensable service-connected disability of 30 percent or more.
(2) Subgroup A includes each preference eligible employee not included in subgroup AD.
(3) Subgroup B includes each nonpreference eligible employee.
(d) A retired member of a uniformed service is considered a preference eligible under this part only if the member meets at least one of the conditions of the following paragraphs (d)(1), (2), or (3) of this section, except as limited by paragraph (d)(4) or (d)(5):
(1) The employee's military retirement is based on disability that either:
(i) Resulted from injury or disease received in the line of duty as a direct result of armed conflict; or
(ii) Was caused by an instrumentality of war incurred in the line of duty during a period of war as defined by sections 101 and 301 of title 38, United States Code.
(2) The employee's retired pay from a uniformed service is not based upon 20 or more years of full-time active service, regardless of when performed but not including periods of active duty for training.
(3) The employee has been continuously employed in a position covered by this part since November 30, 1964, without a break in service of more than 30 days.
(4) An employee retired at the rank of major or above (or equivalent) is considered a preference eligible under this part if such employee is a disabled veteran as defined in section 2108(2) of title

6

EXHIBIT 2

Attachment 5

5, United States Code, and meets one of the conditions covered in paragraph (d)(1), (2), or (3) of this section.

(5) An employee who is eligible for retired pay under chapter 67 of title 10, United States Code. and who retired at the rank of major or above (or equivalent) is considered a preference eligible under this part at age 60, only if such employee is a disabled veteran as defined in section 2108(2) of title 5, United States Code.

[56 FR 10142, March 11, 1991; 60 FR 3062, Jan. 13, 1995; 62 FR 62500, Nov. 24, 1997]

§ 351.502 Order of retention, excepted service.

(a) Competing employees shall be classified on a retention register in tenure groups on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as set forth under § 351.501(a) for competing employees in the competitive service.

(b) Groups are defined as follows:

(1) Group I includes each permanent employee whose appointment carries no restriction or condition such as conditional, indefinite, specific time limit, or trial period.

(2) Group II includes each employee:

(i) Serving a trial period; or

(ii) Whose tenure is equivalent to a career-conditional appointment in the competitive service in agencies having such excepted appointments.

(3) Group III includes each employee:

(i) Whose tenure is indefinite (i.e., without specific time limit), but not actually or potentially permanent;

(ii) Whose appointment has a specific time limitation of more than 1 year; or

(iii) Who is currently employed under a temporary appointment limited to 1 year or less, but who has completed 1 year of current continuous service under a temporary appointment with no break in service of 1 workday or more.

[60 FR 3063, Jan. 13, 1995]

§ 351.503 Length of service.

(a) Each agency shall establish a service date for each competing employee.

(b) An employee's service date is whichever of the following dates reflects the employee's creditable service:

(1) The date the employee entered on duty, when he or she has no previous creditable service;

(2) The date obtained by subtracting the employee's total creditable previous service from the date he or she last entered on duty; or

(3) The date obtained by subtracting from the date in paragraph (b)(1) or (b)(2) of this section, the service equivalent allowed for performance ratings under § 351.504.

(c) An employee who is a retired member of a uniformed service is entitled to credit under this part for:

(1) The length of time in active service in the armed forces during a war, or in a campaign or expedition for which a campaign badge has been authorized; or

(2) The total length of time in active service in the armed forces if the employee is considered a preference eligible under § 351.501(d) of this part.

(d) Each agency shall adjust the service date for each employee to withhold credit for noncreditable time.

§ 351.504 Credit for performance.

Note to § 351.504: Compliance dates: Subject to the requirements of 5 U.S.C. Section 7116(a)(7), agencies may implement revised § 351.504 at any time between December 24, 1997 and October 1, 1998. For reduction in force actions effective between December 24, 1997 and September 30, 1998, agencies may use either § 351.504 effective December 24, 1997, or the prior § 351.504 in 5 CFR part 351 (January 1, 1997 edition).

(a) Ratings used.

(1) Only ratings of record as defined in § 351.203 shall be used as the basis for granting additional retention service credit in a reduction in force.

(2) For employees who received ratings of record while covered by part 430, subpart B, of this chapter, those ratings of record shall be used to grant additional retention service credit in a reduction in force.

EXHIBIT 2

**Attachment 5**

(3) For employees who received performance ratings while not covered by the provisions of 5 U.S.C. Chapter 43 and part 430, subpart B, of this chapter, those performance ratings shall be considered ratings of record for granting additional retention service credit in a reduction in force only when it is determined that those performance ratings are equivalent ratings of record under the provisions of § 430.201(c) of this chapter. The agency conducting the reduction in force shall make that determination.

(b)(1) An employee's entitlement to additional retention service credit for performance under this subpart shall be based on the employee's three most recent ratings of record received during the 4-year period prior to the date of issuance of reduction in force notices, except as otherwise provided in paragraphs (b)(2) and (c) of this section.
(2) To provide adequate time to determine employee retention standing, an agency may provide for a cutoff date, a specified number of days prior to the issuance of reduction in force notices after which no new ratings of record will be put on record and used for purposes of this subpart. When a cutoff date is used, an employee will receive performance credit for the three most recent ratings of record received during the 4-year period prior to the cutoff date.
(3) To be creditable for purposes of this subpart, a rating of record must have been issued to the employee, with all appropriate reviews and signatures, and must also be on record (i.e., the rating of record is available for use by the office responsible for establishing retention registers).
(4) The awarding of additional retention service credit based on performance for purposes of this subpart must be uniformly and consistently applied within a competitive area, and must be consistent with the agency's appropriate issuance(s) that implement these policies. Each agency must specify in its appropriate issuance(s):
(i) The conditions under which a rating of record is considered to have been received for purposes of determining whether it is within the 4-year period prior to either the date the agency issues reduction in force notices or the agency-established cutoff date for ratings of record, as appropriate; and
(ii) If the agency elects to use a cutoff date, the number of days prior to the issuance of reduction in force notices after which no new ratings of record will be put on record and used for purposes of this subpart.
(c) Missing ratings. Additional retention service credit for employees who do not have three actual ratings of record during the 4-year period prior to the date of issuance of reduction in force notices or the 4-year period prior to the agency-established cutoff date for ratings of record permitted in paragraph (b)(2) of this section shall be determined under paragraphs (d) or (e) of this section, as appropriate, and as follows:
(1) An employee who has not received any rating of record during the 4-year period shall receive credit for performance based on the modal rating for the summary level pattern that applies to the employee's official position of record at the time of the reduction in force.
(2) An employee who has received at least one but fewer than three previous ratings of record during the 4-year period shall receive credit for performance on the basis of the value of the actual rating(s) of record divided by the number of actual ratings received. If an employee has received only two actual ratings of record during the period, the value of the ratings is added together and divided by two (and rounded in the case of a fraction to the next higher whole number) to determine the amount of additional retention service credit. If an employee has received only one actual rating of record during the period, its value is the amount of additional retention service credit provided.
(d) Single rating pattern. If all employees in a reduction in force competitive area have received ratings of record under a single pattern of summary levels as set forth in § 430.208(d) of this chapter, the additional retention service credit provided to employees shall be expressed in additional years of service and shall consist of the mathematical average (rounded in the case of a fraction to the next higher whole number) of the employee's applicable ratings of record, under paragraphs (b)(1) and (c) of this section computed on the following basis:
(1) Twenty additional years of service for each rating of record with a Level 5 (Outstanding or equivalent) summary;
(2) Sixteen additional years of service for each rating of record with a Level 4 summary; and

**EXHIBIT 2**

**Attachment 5**

(3) Twelve additional years of service for each rating of record with a Level 3 (Fully Successful or equivalent) summary.

(e) Multiple rating patterns. If an agency has employees in a competitive area who have ratings of record under more than one pattern of summary levels, as set forth in § 430.208(d) of this chapter, it shall consider the mix of patterns and provide additional retention service credit for performance to employees expressed in additional years of service in accordance with the following:

(1) Additional years of service shall consist of the mathematical average (rounded in the case of a fraction to the next higher whole number) of the additional retention service credit that the agency established for the summary levels of the employee's applicable rating(s) of record.

(2) The agency shall establish the amount of additional retention service credit provided for summary levels only in full years; the agency shall not establish additional retention service credit for summary levels below Level 3 (Fully Successful or equivalent).

(3) When establishing additional retention service credit for the summary levels at Level 3 (Fully Successful or equivalent) and above, the agency shall establish at least 12 years, and no more than 20 years, additional retention service credit for a summary level.

(4) The agency may establish the same number of years additional retention service credit for more than one summary level.

(5) The agency shall establish the same number of years additional retention service credit for all ratings of record with the same summary level in the same pattern of summary levels as set forth in § 430.208(d) of this chapter.

(6) The agency may establish a different number of years additional retention service credit for the same summary level in different patterns.

(7) In implementing paragraph (e) of this section, the agency shall specify the number(s) of years additional retention service credit that it will establish for summary levels. This information shall be made readily available for review.

(8) The agency may apply paragraph (e) of this section only to ratings of record put on record on or after October 1, 1997. The agency shall establish the additional retention service credit for ratings of record put on record prior to that date in accordance with paragraph (d) of this section. [56 FR 65416, Dec. 17, 1991; 62 FR 62501, Nov. 24, 1997]

§ 351.505 Records.

Each agency shall maintain the current correct records needed to determine the retention standing of its competing employees. The agency shall allow the inspection of its retention registers and related records by:

(a) A representative of OPM; and

(b) An employee of the agency to the extent that the registers and records have a bearing on a specific action taken, or to be taken, against the employee.

The agency shall preserve intact all registers and records relating to an employee for at least 1 year from the date the employee is issued a specific notice.

§ 351.506 Effective date of retention standing.

Except for applying the performance factor as provided in § 351.504:

(a) The retention standing of each employee released from a competitive level in the order prescribed in § 351.601 is determined as of the date the employee is so released.

(b) The retention standing of each employee retained in a competitive level as an exception under § 351.606(b), § 351.607, or § 351.608, is determined as of the date the employee would have been released had the exception not been used. The retention standing of each employee retained under any of these provisions remains fixed until completion of the reduction in force action which resulted in the temporary retention.

(c) When an agency discovers an error in the determination of an employee's retention standing, it shall correct the error and adjust any erroneous reduction-in-force action to accord with the employee's proper retention standing as of the effective date established by this section. [60 FR 3063, Jan. 13, 1995; 62 FR 10682, March 10, 1997]

SUBPART F. RELEASE FROM COMPETITIVE LEVEL

Source: 51 FR 323, Jan. 3, 1986, unless otherwise noted.

§ 351.601 Order of release from competitive level.

EXHIBIT 2

**Attachment 5**

(a) Each agency shall select competing employees for release from a competitive level under this part in the inverse order of retention standing, beginning with the employee with the lowest retention standing on the retention register.   An agency may not release a competing employee from a competitive level while retaining in that level an employee with lower retention standing except:

(1) As required under § 351.606 when an employee is retained under a mandatory exception or under § 351.806 when an employee is entitled to a new written notice of reduction in force; or

(2) As permitted under § 351.607 when an employee is retained under a permissive continuing exception or under § 351.608 when an employee is retained under a permissive temporary exception.

(b) When employees in the same retention subgroup have identical service dates and are tied for release from a competitive level, the agency may select any tied employee for release.

§ 351.602 Prohibitions.

An agency may not release a competing employee from a competitive level while retaining in that level an employee with:

(a) A specifically limited temporary appointment;

(b) A specifically limited temporary or term promotion;

(c) A written decision under part 432 or 752 of this chapter of removal or demotion from the competitive level.

[62 FR 62502, Nov. 24, 1997]

§ 351.603 Actions subsequent to release from competitive level.

An employee reached for release from a competitive level shall be offered assignment to another position in accordance with Subpart G of this part.   If the employee accepts, the employee shall be assigned to the position offered.   If the employee has no assignment right or does not accept an offer under Subpart G, the employee shall be furloughed or separated.

§ 351.604 Use of furlough.

(a) An agency may furlough a competing employee only when it intends within 1 year to recall the employee to duty in the position from which furloughed.

(b) An agency may not separate a competing employee under this part while an employee with lower retention standing in the same competitive level is on furlough.

(c) An agency may not furlough a competing employee for more than 1 year.

(d) When an agency recalls employees to duty in the competitive level from which furloughed, it shall recall them in the order of their retention standing, beginning with highest standing employee.

§ 351.605 Liquidation provisions.

When an agency will abolish all positions in a competitive area within 180 days, it must release employees in group and subgroup order consistent with § 351.601(a).   At its discretion, the agency may release the employees in group order without regard to retention standing within a subgroup, except as provided in § 351.606.   When an agency releases an employee under this section, the notice to the employee must cite this authority and give the date the liquidation will be completed.   An agency may also apply §§ 351.607 and 351.608 in a liquidation.

[60 FR 2678, Jan. 11, 1995]

§ 351.606 Mandatory exceptions.

(a) Armed Forces restoration rights.   When a agency applies § 351.601 or § 351.605, it shall give retention priorities over other employees in the same subgroup to each group I or II employee entitled under 38 U.S.C. 2021 or 2024 to retention for, as applicable, 6 months or 1 year after restoration, as provided in part 353 of this chapter.

(b) Use of annual leave to reach initial eligibility for retirement or continuance of health benefits.

(1) An agency shall make a temporary exception under this section to retain an employee who is being involuntarily separated under this part, and who elects to use annual leave to remain on the agency's rolls after the effective date the employee would otherwise have been separated by reduction in force, in order to establish initial eligibility for immediate retirement under 5 U.S.C. 8336, 8412, or 8414, and/or to establish initial eligibility under 5 U.S.C. 8905 to continue health benefits coverage into retirement.

(2) An agency shall make a temporary exception under this section to retain an employee who is being involuntarily separated under authority of part 752 of this chapter because of the employee's

INVESTIGATIVE REPORT

EXHIBIT 2

Attachment 5

decision to decline relocation (including transfer of function), and who elects to use annual leave to remain on the agency's rolls after the effective date the employee would otherwise have been separated by adverse action, in order to establish initial eligibility for immediate retirement under 5 U.S.C. 8336, 8412, or 8414, and/or to establish initial eligibility under 5 U.S.C. 8905 to continue health benefits coverage into retirement.

(3) An employee retained under paragraph (b) by this section must be covered by chapter 63 of title 5, United States Code.

(4) An agency may not retain an employee under paragraph (b) of this section past the date that the employee first becomes eligible for immediate retirement, or for continuation of health benefits into retirement, except that an employee may be retained long enough to satisfy both retirement and health benefits requirements.

(5) Except as permitted by 5 CFR 351.608(d), an agency may not approve an employee's use of any other type of leave after the employee has been retained under a temporary exception authorized by paragraph (b) of this section.

(6) Annual leave for purposes of paragraph (b) of this section is described in § 630.212 of this chapter.

(c) Documentation.  Each agency shall record on the retention register, for inspection by each employee, the reasons for any deviation from the order of release required by § 351.601 or § 351.605.

[62 FR 10682, March 10, 1997]

§ 351.607 Permissive continuing exceptions.

An agency may make exception to the order of release in § 351.601 and to the action provisions of § 351.603 when needed to retain an employee on duties that cannot be taken over within 90 days and without undue interruption to the activity by an employee with higher retention standing. The agency shall notify in writing each higher-standing employee reached for release from the same competitive level of the reasons for the exception.

§ 351.608 Permissive temporary exceptions.

(a) General.

(1) In accordance with this section, an agency may make a temporary exception to the order of release in § 351.601, and to the action provisions of § 351.603, when needed to retain an employee after the effective date of a reduction in force.  Except as otherwise provided in paragraphs (c) and (e) of this section, an agency may not make a temporary exception for more than 90 days.

(2) After the effective date of a reduction in force action, an agency may not amend or cancel the reduction in force notice of an employee retained under a temporary exception so as to avoid completion of the reduction in force action.  This does not preclude the employee from receiving or accepting a job offer in the same competitive area in accordance with a Reemployment Priority List established under part 330, subpart B, of this chapter, or under a Career Transition Assistance Plan established under part 330, subpart E, of this chapter, or equivalent programs.

(b) Undue interruption.  An agency may make a temporary exception for not more than 90 days when needed to continue an activity without undue interruption.

(c) Government obligation.  An agency may make a temporary exception to satisfy a Government obligation to the retained employee without regard to the 90-day limit set forth under paragraph (a)(1) of this section.

(d) Sick leave.  An agency may make a temporary exception to retain on sick leave a lower standing employee covered by chapter 63 of title 5, United States Code (or other applicable leave system for Federal employees), who is on approved sick leave on the effective date of the reduction in force, for a period not to exceed the date the employee's sick leave is exhausted. Use of sick leave for this purpose must be in accordance with the requirements in part 630, subpart D, of this chapter (or other applicable leave system for Federal employees).  Except as authorized by § 351.606(b), an agency may not approve an employee's use of any other type of leave after the employee has been retained under this paragraph (d).

(e)(1) An agency may make a temporary exception to retain on accrued annual leave a lower standing employee who:

(i) Is being involuntarily separated under this part;

INVESTIGATIVE REPORT                                    EXHIBIT 2

**Attachment 5**

(ii) is covered by a Federal leave system under authority other than chapter 63 of title 5, United States Code; and,

(iii) Will attain first eligibility for an immediate retirement benefit under 5 U.S.C. 8336, 8412, or 8414 (or other authority), and/or establish eligibility under 5 U.S.C. 8905 (or other authority) to carry health benefits coverage into retirement during the period represented by the amount of the employee's accrued annual leave.

(2) An agency may not approve an employee's use of any other type of leave after the employee has been retained under this paragraph (e).

(3) This exception may not exceed the date the employee first becomes eligible for immediate retirement or for continuation of health benefits into retirement, except that an employee may be retained long enough to satisfy both retirement and health benefits requirements.

(4) Accrued annual leave includes all accumulated, accrued, and restored annual leave, as applicable, in addition to annual leave earned and available to the employee after the effective date of the reduction in force. When approving a temporary exception under this provision, an agency may not advance annual leave or consider any annual leave that might be credited to an employee's account after the effective date of the reduction in force other than annual leave earned while in an annual leave status.

(f) Other exceptions. An agency may make a temporary exception under this section to extend an employee's separation date beyond the effective date of the reduction in force when the temporary retention of a lower standing employee does not adversely affect the right of any higher standing employee who is released ahead of the lower standing employee. The agency may establish a maximum number of days, up to 90 days, for which an exception may be approved.

(g) Notice to employees. When an agency approves an exception for more than 30 days, it must:

(1) Notify in writing each higher standing employee in the same competitive level reached for release of the reasons for the exception and the date the lower standing employee's retention will end; and

(2) List opposite the employee's name on the retention register the reasons for the exception and the date the employee's retention will end.

[58 FR 5563, Jan. 22, 1993; 60 FR 2678, Jan. 11, 1995; 62 FR 10682, March 10, 1997]

SUBPART G. ASSIGNMENT RIGHTS (BUMP AND RETREAT)

Source: 51 FR 324, Jan. 3, 1986, unless otherwise noted.

§ 351.701 Assignment involving displacement.

(a) General. When a group I or II competitive service employee with a current annual performance rating of record of minimally successful (Level 2) or equivalent, or higher, is released from a competitive level, an agency shall offer assignment, rather than furlough or separate, in accordance with paragraphs (b), (c), and (d) of this section to another competitive position which requires no reduction, or the lease possible reduction, in representative rate. The employee must be qualified for the offered position. The offered position shall be in the same competitive area, last at least 3 months, and have the same type of work schedule (e.g., full-time, part-time, intermittent, or seasonal) as the position from which the employee is released. Upon accepting an offer of assignment, or displacing another employee under this part, an employee retains the same status and tenure in the new position. The promotion potential of the offered position is not a consideration in determining an employee's right of assignment.

(b) Lower subgroup, bumping. A released employee shall be assigned in accordance with paragraph (a) of this section and bump to a position that:

(1) Is held by another employee in a lower tenure group or in a lower subgroup within the same tenure group; and

(2) Is no more than three grades (or appropriate grade intervals or equivalent) below the position from which the employee was released.

(c) Same subgroup, retreating. A released employee shall be assigned in accordance with paragraphs (a) and (d) of this section and retreat to a position that:

(1) Is held by another employee with lower retention standing in the same tenure group and subgroup;

(2) Is not more than three grades (or appropriate grade intervals or equivalent) below the position from which the employee was released, except that for a preference eligible employee with a

**EXHIBIT 2**

Attachment 5

compensable service-connected disability of 30 percent or more the limit is five grades (or appropriate grade intervals or equivalent); and

(3) Is the same position, or an essentially identical position, held by the released employee on a permanent basis in a Federal agency. (In determining whether a position is essentially identical, the determination is based on the competitive level criteria found in 5 CFR 351.403, but not necessarily in regard to the respective grade, classification series, type of work schedule, or type of service, of the two positions.)

(d) Limitation. An employee with a current annual performance rating of record of minimally successful (Level 2) or equivalent may be assigned under paragraph (c) of this section only to a position held by another employee with a current annual performance rating of record no higher than minimally successful (Level 2) or equivalent.

(e) Pay rates.

(1) The determination of equivalent grade intervals shall be based on a comparison of representative rates.

(2) Each employee's assignment rights shall be determined on the basis of the pay rates in effect on the date of issuance of specific reduction-in-force notices, except that when it is officially known on the date of issuance of notices that new pay rates have been approved and will become effective by the effective date of the reduction in force, assignment rights shall be determined on the basis of the new pay rates.

(f)(1) In determining applicable grades (or grade intervals) under §§ 351.701(b)(2) and 351.701(c)(2), the agency uses the grade progression of the released employee's position of record to determine the grade (or interval) limits of the employee's assignment rights.

(2) For positions covered by the General Schedule, the agency must determine whether a one-grade, two-grade, or mixed grade interval progression is applicable to the position of the released employee.

(3) For positions not covered by the General Schedule, the agency must determine the normal line of progression for each occupational series and grade level to determine the grade (or interval) limits of the released employee's assignment rights. If the agency determines that there is no normal line of progression for an occupational series and grade level, the agency provides the released employee with assignment rights to positions within three actual grades lower on a one-grade basis. The normal line of progression may include positions in different pay systems.

(4) For positions where no grade structure exists, the agency determines a line of progression for each occupation and pay rate, and provides assignment rights to positions within three grades (or intervals) lower on that basis.

(5) If the released employee holds a position that is less than three grades above the lowest grade in the applicable classification system (e.g., the employee holds a GS-2 position), the agency provides the released employee with assignment rights up to three actual grades lower on a one-grade basis in other pay systems.

[56 FR 65417, Dec. 17, 1991; 60 FR 3063, Jan. 13, 1995; 60 FR 44254, Aug. 25, 1995; 62 FR 62502, Nov. 24, 1997]

§ 351.702 Qualifications for assignment.

(a) Except as provided in § 351.703, an employee is qualified for assignment under § 351.701 if the employee:

(1) Meets the OPM standards and requirements for the position, including any minimum educational requirement, and any selective placement factors established by the agency;

(2) Is physically qualified, with reasonable accommodation where appropriate, to perform the duties of the position;

(3) Meets any special qualifying condition which the OPM has approved for the position; and

(4) Has the capacity, adaptability, and special skills needed to satisfactorily perform the duties of the position without undue interruption. This determination includes recency of experience, when appropriate.

(b) The sex of an employee may not be considered in determining whether an employee is qualified for a position, except for positions which OPM has determined certification of eligibles by sex is justified.

(c) An employee who is released from a competitive level during a leave of absence because of a compensable injury may not be denied an assignment right solely because the employee is not

13

EXHIBIT 2

Attachment 5

physically qualified for the duties of the position if the physical disqualification resulted from the compensable injury.  Such an employee must be afforded appropriate assignment rights subject to recovery as provided by 5 U.S.C. 8151 and Part 353 of this chapter.

(d) If an agency determines, on the basis of evidence before it, that a preference eligible employee who has a compensable service-connected disability of 30 percent or more is not able to fulfill the physical requirements of a position to which the employee would otherwise have been assigned under this part, the agency must notify the OPM of this determination.  At the same time, the agency must notify the employee of the reasons for the determination and of the right to respond, within 15 days of the notification, to the OPM which will require the agency to demonstrate that the notification was timely sent to the employee's last known address.  The OPM shall make a final determination concerning the physical ability of the employee to perform the duties of the position.  This determination must be made before the agency may select any other person for the position.  When the OPM has completed its review of the proposed disqualification on the basis of physical disability, it must sent its finding to both the agency and the employee.  The agency must comply with the findings of the OPM.  The functions of the OPM under this paragraph may not be delegated to an agency.

(e) An agency may formally designate as a trainee or developmental position a position in a program with all of the following characteristics:

(1) The program must have been designed to meet the agency's needs and requirements for the development of skilled personnel;

(2) The program must have been formally designated, with its provisions made known to employees and supervisors;

(3) The program must be developmental by design, offering planned growth in duties and responsibilities, and providing advancement in recognized lines of career progression; and

(4) The program must be fully implemented, with the participants chosen through standard selection procedures.  To be considered qualified for assignment under § 351.701 to a formally designated trainee or developmental position in a program having all of the characteristics covered in paragraphs (e)(1), (2), (3), and (4) of this section, an employee must meet all of the conditions required for selection and entry into the program.

[60 FR 3063, Jan. 13, 1995]

§ 351.703 Exception to qualifications.

An agency may assign an employee to a vacant position under § 351.201(b) or § 351.701 of this part without regard to OPM's standards and requirements for the position if:

(a) The employee meets any minimum education requirement for the position; and

(b) The agency determines that the employee has the capacity, adaptability, and special skills needed to satisfactorily perform the duties and responsibilities of the position.

[56 FR 65417, Dec. 17, 1991]

§ 351.704 Rights and prohibitions.

(a)(1) An agency may satisfy an employee's right to assignment under § 351.701 by assignment under § 351.201(b) or § 351.705 to a position having a representative rate equal to that to which he or she would be entitled under § 351.701.

(2) An agency may, at its discretion, choose to offer a vacant other-than-full-time position to a full-time employee or to offer a vacant full-time position to an other-than-full-time employee in lieu of separation by reduction in force.

(b) Section 351.701 does not:

(1) Authorize or permit an agency to assign an employee to a position having a higher representative rate;

(2) Authorize or permit an agency to displace a full-time employee by an other-than-full-time employee, or to satisfy an other-than-full-time employee's right to assignment by assigning the employee to a vacant full-time position.

(3) Authorize or permit an agency to displace an other-than-full-time employee by a full-time employee, or to satisfy a full-time employee's right to assignment by assigning the employee to a vacant other-than-full-time position.

(4) Authorize or permit an agency to assign a competing employee to a temporary position (i.e., a position under an appointment not to exceed 1 year), except as an offer of assignment in lieu of separation by reduction in force under this part when the employee has no right to a position

14

EXHIBIT 2

Attachment 5

under § 351.701 or § 351.704(a)(1) of this part. This option does not preclude an agency from, as an alternative, also using a temporary position to reemploy a competing employee following separation by reduction in force under this part.

(5) Authorize or permit an agency to displace an employee or to satisfy a competing employee's right to assignment by assigning the employee to a position with a different type of work schedule (e.g., full-time, part-time, intermittent, or seasonal) than the position from which the employee is released.

[56 FR 65417, Dec. 17, 1991; 60 FR 3063, Jan. 13, 1995]

§ 351.705 Administrative assignment.

(a) An agency may, at its discretion, adopt provisions which:

(1) Permit a competing employee to displace an employee with lower retention standing in the same subgroup consistent with § 351.701 when the agency cannot make an equally reasonable assignment by displacing an employee in a lower subgroup;

(2) Permit an employee in subgroup III-AD to displace an employee in subgroup III-A or III-B, or permit an employee in subgroup III-A to displace an employee is subgroup III-B consistent with § 351.701; or

(3) Provide competing employees in the excepted service with assignment rights to other positions under the same appointing authority on the same basis as assignment rights provided to competitive service employees under § 351.701 and in paragraphs (a)(1) and (2) of this section.

(b) Provisions adopted by an agency under paragraph (a) of this section:

(1) Shall be consistent with this part;

(2) Shall be uniformly and consistently applied in any one reduction in force;

(3) May not provide for the assignment of an other-than-full-time employee to a full-time position;

(4) May not provide for the assignment of a full-time employee to an other-than-full-time position;

(5) May not provide for the assignment of an employee in a competitive service position to a position in the excepted service; and

(6) May not provide for the assignment of an employee in an excepted position to a position in the competitive service.

[62 FR 62502, Nov. 24, 1997]

SUBPART H. NOTICE TO EMPLOYEE

Source: 56 FR 43996, Sept. 6, 1991; 58 FR 32047, June 8, 1993; 60 FR 2678, 2679, Jan. 11, 1995, unless otherwise noted.

§ 351.801 Notice period.

(a)(1) Except as provided in paragraph (b) of this section, each competing employee selected for release from a competitive level under this part is entitled to a specific written notice at least 60 full days before the effective date of release.

(2) Under authority of section 4433 of Pub.L. 102-484, as amended by section 911(a) of Pub.L. 103-337, each competing employee of the Department of Defense is entitled, under implementing regulations issued by that agency to a specific written notice at least 120 full days before the effective date of release when a significant number of employees will be separated by reduction in force. The 120 days notice requirement is applicable during the period from January 20, 1993, through January 31, 2000. The basic requirement for 60 full days specific written notice set forth in paragraph (a) of this section is still applicable when less than a significant number of employees will be separated by reduction in force.

(3) At the same time an agency issues a notice to an employee, it must give a written notice to the exclusive representative(s), as defined in 5 U.S.C. 7103(a)(16), of each affected employee at the time of the notice. When a significant number of employees will be separated, an agency must also satisfy the notice requirements of §§ 351.803 (b) and (c).

(b) When a reduction in force is caused by circumstances not reasonably foreseeable, the Director of OPM, at the request of an agency head or designee, may approve a notice period of less than 60 days, or a notice period of less than 120 days when a significant number of Department of Defense employees will be separated. The shortened notice period must cover at least 30 full days before the effective date of release. An agency request to OPM shall specify:

(1) The reduction in force to which the request pertains;

(2) The number of days by which the agency requests that the period be shortened;

(3) The reasons for the request; and

15

                                              EXHIBIT 2

**Attachment 5**

(4) Any other additional information that OPM may specify.
(c) The notice period begins the day after the employee receives the notice.
(d) When an agency retains an employee under § 351.607 or § 351.608, the notice to the employee shall cite the date on which the retention period ends as the effective date of the employee's release from the competitive level.
[60 FR 44254, Aug. 25, 1995]
§ 351.802 Content of notice.
(a)(1) The action to be taken, the reasons for the action, and its effective date;
(2) The employee's competitive area, competitive level, subgroup, service date, and three most recent ratings of record received during the last 4 years.
(3) The place where the employee may inspect the regulations and record pertinent to this case;
(4) The reasons for retaining a lower-standing employee in the same competitive level under § 351.607 or § 351.608;
(5) Information on reemployment rights, except as permitted by § 351.803(a); and
(6) The employee's right, as applicable, to appeal to the Merit Systems Protection Board under the provisions of the Board's regulations or to grieve under a negotiated grievance procedure. The agency shall also comply with § 1201.21 of this title.
(b) When an agency issues an employee a notice, the agency must, upon the employee's request, provide the employee with a copy of OPM's retention regulations found in part 351 of this chapter.
[60 FR 44254, Aug. 25, 1995; 62 FR 62502, Nov. 24, 1997]
§ 351.803 Notice of eligibility for reemployment and other placement assistance.
(a) An employee who receives a specific notice of separation under this part must be given information concerning the right to reemployment consideration and career transition assistance under subparts B (Reemployment Priority List), F and G (Career Transition Assistance Programs) of part 330 of this chapter. The employee must also be given a release to authorize, at his or her option, the release of his or her resume and other relevant employment information for employment referral to State dislocated worker unit(s) and potential public or private sector employers. The employee must also be given information concerning how to apply both for unemployment insurance through the appropriate State program and benefits available under the State dislocated worker unit(s), as designated or created under title III of the Job Training Partnership Act, and an estimate of severance pay (if eligible).
Note to § 351.803(a): Compliance dates: Subject to the requirements of 5 U.S.C. 7116(a)(7), agencies may implement revised § 351.803(a) at any time between December 24, 1997 and October 1, 1998. For reduction in force actions effective between December 24, 1997 and September 30, 1998, agencies may use either § 351.803(a) effective December 24, 1997, or the prior § 351.803(a) in 5 CFR part 351 (January 1, 1997 edition).
(b) When 50 or more employees in a competitive area receive separation notices under this part, the agency must provide written notification of the action, at the same time it issues specific notices of separation to employees, to:
(1) The State dislocated worker unit(s), as designated or created under title III of the Job Training Partnership Act;
(2) The chief elected official of local government(s) within which these separations will occur; and
(3) OPM.
(c) The notice required by paragraph (b) of this section must include:
(1) The number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM);
(2) The effective date of the separations; and
(3) Any other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services.
[62 FR 62502, Nov. 24, 1997]
§ 351.804 Expiration of notice.
(a) A notice expires when followed by the action specified, or by an action less severe than specified, in the notice or in an amendment made to the notice before the agency takes the action.

16

EXHIBIT 2

**Attachment 5**

(b) An agency may not take the action before the effective date in the notice; instead, the agency may cancel the reduction in force notice and issue a new notice subject to this subpart.
[62 FR 62502, Nov. 24, 1997]
§ 351.805 New notice required.
(a) An employee is entitled to a written notice of, as appropriate, at least 60 or 120 full days if the agency decides to take an action more severe than first specified.
(b) An agency must give an employee an amended written notice if the reduction in force is changed to a later date. A reduction in force action taken after the date specified in the notice given to the employee is not invalid for that reason, except when it is challenged by a higher-standing employee in the competitive level who is reached out of order for a reduction in force action as a result of the change in dates.
(c) An agency must give an employee an amended written notice and allow the employee to decide whether to accept a better offer of assignment under subpart G of this part that becomes available before or on the effective date of the reduction in force. The agency must give the employee the amended notice regardless of whether the employee has accepted or rejected a previous offer of assignment, provided that the employee has not voluntarily separated from his or her official position.
[62 FR 62502, Nov. 24, 1997]
§ 351.806 Status during notice period.
When possible, the agency shall retain the employee on active duty status during the notice period. When in an emergency the agency lacks work or funds for all or part of the notice period, it may place the employee on annual leave with or without his or her consent, or leave without pay with his or her consent, or in a nonpay status without his or her consent.
§ 351.807 Certification of expected separation.
(a) For the purpose of enabling otherwise eligible employees to be considered for eligibility to participate in dislocated worker programs under the Job Training Partnership Act administered by the U.S. Department of Labor, an agency may issue a Certificate of Expected Separation to a competing employee who the agency believes, with a reasonable degree of certainty, will be separated from Federal employment by reduction in force procedures under this part. A certification may be issued up to 6 months prior to the effective date of the reduction in force.
(b) This certification may be issued to a competing employee only when the agency determines:
(1) There is a good likelihood the employee will be separated under this part;
(2) Employment opportunities in the same or similar position in the local commuting area are limited or nonexistent;
(3) Placement opportunities within the employee's own or other Federal agencies in the local commuting area are limited or nonexistent; and
(4) If eligible for optional retirement, the employee has not filed a retirement application or otherwise indicated in writing an intent to retire.
(c) A certification is to be addressed to each individual eligible employee and must be signed by an appropriate agency official. A certification must contain the expected date of reduction in force, a statement that each factor in paragraph (b) of this section has been satisfied, and a description of Job Training Partnership Act programs, the Interagency Placement Program, and the Reemployment Priority List.
(d) A certification may not be used to satisfy any of the notice requirements elsewhere in this subpart.
(e) An agency determination of eligibility for certification may not be appealed to OPM or the Merit Systems Protection Board.
(f) An agency may also enroll eligible employees in the Interagency Placement Program and the Reemployment Priority List up to 6 months in advance of a reduction in force. For requirements and criteria for these programs, see subparts B and C of part 330 of this chapter.
[60 FR 44254, Aug. 25, 1995]
SUBPART I. APPEALS AND CORRECTIVE ACTION
Source: 51 FR 326, Jan. 3, 1986, unless otherwise noted.
§ 351.901 Appeals.
An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board.

17

**EXHIBIT 2**

**Attachment 5**

[52 FR 46051, Dec. 4, 1987]
§ 351.902 Correction by agency.
When an agency decides that an action under this part was unjustified or unwarranted and restores an individual to the former grade or rate of pay held or to an intermediate grade or rate of pay, it shall make the restoration retroactively effective to the date of the improper action.
SUBPART J. [RESERVED]
§§ 351.1001 to 351.1005 [Reserved]

INVESTIGATIVE REPORT

EXHIBIT 2

16

HUMAN RESOURCES                    **Attachment 2**




**December 14, 1995**

**MANAGERS, HUMAN RESOURCES, AREA**
**MANAGERS, HUMAN RESOURCES, DISTRICT**
**HEADQUARTERS MANAGERS, HUMAN RESOURCES AND LABOR RELATIONS**

**SUBJECT:** Reduction in Force Policies

We have now completed the consultation process with the Management Organizations and are issuing the procedures which will govern EAS placement in future organizational restructurings. Included in the attachments to this memorandum are:

• Reduction in Force (RIF) Overview

This summarizes the manner in which RIFs impacting EAS employees will be conducted in the Postal Service.

• Appendix A - Organizational Change: RIF Avoidance/Minimization

This describes the options available for minimizing the impact on employees in organizational restructuring situations, including steps which will be taken to avoid the need to conduct a RIF or minimize its impact.

• Appendix B - Placement Procedures

This provides a process for RIF placement procedures for EAS employees who are involuntarily downgraded, displaced, or otherwise unplaced as a result of an organizational change.

The issuance of these rules is not an indication of planned major organization structure changes or reduction in planned complement. Having these rules in place is part of having the organization in a "RIF-ready" status. Organization changes as small as the alteration of one position grade raise the issue of RIF.

I have assigned responsibility for management of RIF issues to Steve Moe, Manager, Employment and Placement. He will be working closely with Organization Structure and Job Evaluation to assist managers in assessing the RIF implications of organizational structure changes they may be considering. If you have any questions about RIF implications of personnel placement actions you may be contemplating, please call him at (202) 268-3793.

Gail Sonnenberg

Attachments

cc: All Officers

475 L'Enfant Plaza SW
Washington DC 20260-4200

**U. S. POSTAL SERVICE**
**REDUCTION-IN-FORCE OVERVIEW**

I.  **USE OF REDUCTION-IN-FORCE (RIF)**

Postal management has the responsibility to plan the work and to organize the workforce to accomplish Postal Service objectives within planned resources. Management is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated. Management is responsible for all decisions concerning what positions are abolished, whether a RIF is necessary and when a RIF will take place.

II.  **RIF AVOIDANCE/MINIMIZATION**

In order to avoid or minimize the impact of a proposed RIF, management may implement some or all of the following actions, either in the competitive area proposed to undergo the RIF or in additional specified competitive areas:

A.  Freeze hiring and promotions.

B.  Separate contract employees, temporary employees, and reemployed annuitants.

C.  Reassign career employees out of a competitive area for which a RIF may be required and into vacant positions in competitive areas where a RIF is not being contemplated. Reassignments may be made to positions within or outside the commuting area and may be voluntary (e.g., where an employee has responded to a vacancy announcement) or directed by management. Such assignments are not subject to RIF procedures as long as preference eligible employees are not involuntarily placed into lower grade positions.

NOTE: When circumstances warrant, other RIF avoidance measures may also be undertaken. Where it is possible to avoid separating any employee, or placing any employee into a lower grade position involuntarily, the use of these RIF procedures may be avoided.

III.  **PREFERENCE ELIGIBLES**

For purposes of RIF, preference eligibles in the Postal Service are extended the same rights as they would have in the competitive service. Therefore, the provisions of 5 CFR Parts 351 and 536 are incorporated into these procedures and apply to preference eligibles in the Postal Service.

Preference eligibles who receive no placement on the basis of their RIF rights are considered for remaining available vacant positions in their competitive area prior to the effective date of the RIF along with nonpreference eligible employees, in accordance with the provisions in Section IV, below. To the extent that a preference eligible is placed under the provisions of Section IV, their pay and grade treatment is governed by that section, not by 5 CFR Part 536.

IV.  **NONPREFERENCE ELIGIBLES**

A.  **Nonbargaining Unit Employees**

Nonpreference eligible career nonbargaining unit employees whose positions are abolished or who have been displaced in order to afford a preference eligible his/her RIF placement rights will be placed under these rules.

**EXHIBIT 3**

December 8, 1995

1.  Placement Principles

    a.  Employees will receive at least 60 days advance notice of any proposed RIF downgrade or separation.

    b.  Employees will be given an opportunity to update their qualifications before placement decisions are made.

    c.  Placement of employees as defined above will be to remaining vacant positions within the competitive area.

    d.  Management within the competitive area will make placements into available vacant positions based on a match between the qualifications of the impacted individuals and the requirements of the positions.

    e.  Employees not placed during the process in d. above will be separated. During the 60-day advance notice period of their RIF separation, they will be given the opportunity to apply for vacancies in other competitive areas which are not undergoing a RIF.

    f.  Employees who are not placed as of the effective date of the RIF will be placed into a 30-day non-duty, non-pay status, during which time they may apply noncompetitively for any vacancy at or below their current grade within the commuting area. If no vacancy is identified by the end of the 30-day period, the employees will be separated with applicable severance pay or retirement benefits.

    g.  For two years from the date of their separation, employees have the right to priority consideration for vacancies for which they are qualified. This priority consideration is limited to competitive areas within commuting distance of the competitive area from which they have been released and which are not undergoing a RIF.

2.  Salary Treatment

    Employees placed in lower grade positions as the result of these procedures will be reduced immediately to the grade of the position in which they are placed. The employee's salary at the time of the placement in the lower grade position will be retained for two years. At the end of the salary retention period the salary will be reduced to the maximum of the lower grade, or retain present salary, whichever is lower.

B.  Bargaining Unit Employees

Career bargaining unit employees whose positions are abolished or who have been displaced in order to afford a preference eligible his/her RIF placement rights will have their placement rights determined under the provisions of the applicable collective bargaining agreement.

EXHIBIT 3

APPENDIX A

ORGANIZATIONAL CHANGE:
RIF AVOIDANCE/MINIMIZATION

I. PURPOSE

To outline the process for implementing approved changes to the Headquarters or field organizations, while minimizing, or avoiding altogether, the need for a reduction-in-force (RIF).

Organizational changes are defined as any change to the number of positions, their grades, duties, qualification requirements, or locations. *Organizational changes as small as a change in one position in one competitive area can produce the possibility of RIF.*

RIF procedures are required in the Postal Service when an employee is released from a position because of an organizational change resulting in a demotion, separation, or reassignment causing a displacement.

A change to lower grade based on the reclassification of an employee's position due to a change in classification standards or a correction of classification error, is not a RIF. A change to lower grade based on the erosion of duties is not a RIF, unless a RIF will take effect within 180 days within the same competitive area.

II. RESPONSIBILITY

A. Changes to the Headquarters or field structure are initiated by functional management.

B. Plan requirements are evaluated by the Manager, Organization Structure and Job Evaluation, who determines the appropriate numbers, descriptions, grade levels, and reporting relationships for positions in the competitive areas involved in the proposed changes, for review by functional management.

C. Impact of proposed changes to employees within the specific competitive area(s) where changes are recommended is determined by the Manager, Employment and Placement, who outlines a preliminary placement plan for consideration by functional management.

D. Upon final approval of the staffing and placement plans, the Manager, Organization Structure and Job Evaluation, makes required staffing changes, and initiates publication of changes to competitive areas, if any. The Manager, Employment and Placement, prepares qualification standards for new positions, assigns new positions to the appropriate competitive levels, and where there is no potential for a RIF, will advise competitive area management to proceed with normal EAS placement procedures in filling the new position(s).

E. Every effort will be made to implement the approved organizational change without the need to downgrade or separate any employee.

F. When one or more employees must be downgraded or separated in order to implement the organizational change, a RIF potential exists. The Manager, Employment and Placement, is responsible for pursuing strategies to minimize, or avoid altogether, the need for RIF.

December 6, 1995

## III. RIF AVOIDANCE/MINIMIZATION STRATEGIES

Subject to the approval of the functional management, the Manager, Employment and Placement, will coordinate some or all of the following actions to be taken by competitive area management where RIF implications exist as a result of the organizational change:

A.  Ensure that competitive area management communicates with employees, either individually or in groups, to explain the options available to them in detail.

B.  Post information for all employees within the competitive area(s) explaining the new positions being added, their numbers, grade levels, and reporting relationships, and the names, grade levels, and numbers of the old positions being abolished.

C.  Approve requests for voluntary changes to vacant positions at lower grades within the competitive area, including craft positions.

D.  Facilitate voluntary requests for reassignments to vacant positions in other competitive areas where there is no RIF potential.

E.  In cooperation with management in other competitive areas where there is no RIF potential, direct reassignments within or outside the commute area to vacancies at employee's same grade.

F.  Freeze hiring and promotions.

G.  Cancel all detail and temporary promotion Forms 50.

H.  Separate contract employees, temporary employees, and/or reemployed annuitants.

I.  Terminate probationary employees.

J.  Offer optional retirement/resignation incentives.

K.  Request early-out authorization from OPM.

L.  Offer early retirement incentives.

## IV. PRELIMINARY PLACEMENTS

A.  The Manager, Employment and Placement, will ensure that appropriate Personnel Office(s) obtains updated Pages 1 and 2 of Forms 991 from all employees within the competitive area(s) undergoing a RIF.

B.  Competitive Area management will then match employees to available positions at their same grades, based on the qualifications of the employees and the requirements of the positions. These matches will not be finalized until the effective date of the RIF.

C.  If the placements in B above would result in the matching of any employee to a lower grade position, or would leave any employee unplaced, the Manager, Employment and Placement, will issue a general notice of RIF to all employees within the competitive area(s), and will oversee the RIF process to ensure strict compliance with regulations.

December 6, 1995

The RIF process requires approximately 100 to 200 days, depending on the number of employees and competitive areas involved.

D. Placement efforts, in accordance with Appendix B, will continue throughout the RIF notice period for employees who are displaced, downgraded, and/or not matched to any position.

**EXHIBIT 3**

APPENDIX B

## RIF PLACEMENT PROCEDURES

### I. PURPOSE

These procedures govern the placement of EAS employees at Headquarters and in the field whose positions have been abolished, or who are downgraded or displaced in order to afford other employees rights in a reduction-in-force (RIF). The procedures also apply to all employees who receive no job offers during a RIF.

### II. PLACEMENT ADMINISTRATION

A. The Manager, Employment and Placement, will advise the appropriate Personnel Office(s) to obtain updated Pages 1 and 2 of PS Form 991 from all employees in the competitive area(s) involved.

B. Using the updated Forms 991, competitive area management will match employees to available positions, based on the qualifications of the employees and the requirements of the positions. These placements cannot be finalized until the effective date of the RIF.

C. If the procedures in B above will permit the placement of all EAS employees without any downgrades or separations, the proposed RIF action will be canceled, and the placements in B above can be finalized. If it is evident that downgrades or separations will occur, the RIF process will go forward.

D. The Manager, Employment and Placement, will issue a general RIF notice to all career EAS employees in the competitive area(s). The notice will ask employees to ensure that updated Pages 1 and 2 of PS Form 991 have been submitted, and to review their personnel records to verify the accuracy of all information which might affect their retention standing.

E. The Manager, Employment and Placement, will oversee the RIF process. Employees who are matched to lower grade positions, who are displaced, or who remain unplaced, will receive at least 60 days advance written notice of downgrade or separation. During the notice period, placement efforts for these employees will continue as outlined in Part III below.

F. Competitive area management will prepare a specific placement plan for approval by the Manager, Employment and Placement. Determination of the plan will be based on the scope of the RIF.

### III. PLACEMENT OPPORTUNITIES DURING THE SPECIFIC RIF NOTICE PERIOD

A. Throughout the RIF notice period, management will remain in close communication with all employees, individually and/or in groups. Lists of vacancies which exist in other competitive areas within commute distance will be made available. The importance of considering alternatives to remaining in the competitive area undergoing the RIF will be emphasized.

**EXHIBIT 3**

B.   Among the options available to career EAS employees will be reassignments out of the competitive area(s) where a RIF is being conducted, and into vacant positions in competitive areas where no RIF is contemplated. Reassignments may be made to positions within or outside the commuting area and may be voluntary (e.g., where an employee has responded to a vacancy announcement) or directed by management. Such assignments are not subject to RIF procedures as long as employees are not involuntarily placed into lower grade positions. Appropriate relocation benefits will be paid for any reassignment outside commute distance to the same or higher grade.

C.   Following the first iteration of the RIF, the placement administrator will be provided with a list of employees as defined in Part I above, along with a list of new EAS vacancies within the competitive area, and EAS vacancies which were offered during the RIF, but which remain vacant. Within the competitive area these positions will be used as placement opportunities during a two-week window beginning with the date of receipt of the lists.

D.   The placement administrator (Human Resources Manager), with the help of a committee, if desired, will Review Forms 991 and establish employee referral lists of individuals who meet the basic qualifications for available vacancies. An employee's name may appear on more than one referral list, if found to be qualified for more than one vacancy. Referral lists must be completed within one week from the date of receipt of the employee and vacancy lists.

E.   The placement administrator will forward the referral lists, Forms 991, position descriptions, and qualifications requirements to the selecting officials. Interviews with employees, and a roundtable, or committee, are optional with selecting officials. However, these selections are tentative, and announcements to employees and preparation of Forms 50 will not occur until the effective date of the RIF, along with those for employees matched in Part II above.

F.   Selecting officials must return the entire placement file to the placement administrator, including the referral list and Forms 991, with a written list of selected employees in rank order, within one week. Selecting officials should list more than one selection for each vacancy, if possible.

G.   If the vacancy cannot be filled from the employee referral list, the selecting official must explain in writing to the placement administrator.

H.   The placement administrator will determine which employees were tentatively matched to more than one job, and will resolve the selection prior to the second iteration of the RIF. Employee preference will be taken into consideration to the extent possible.

I.    During the week prior to the effective date of the RIF, the placement administrator will meet with employees who remain unplaced to discuss in detail the options available to them, as outlined in Part IV.


IV. OPTIONS FOR UNPLACED EMPLOYEES

Options to be discussed with unplaced employees during the last week of the RIF notice period include the following:

A.   Discontinued Service Retirement: If the employee is age 50 with 20 years of service, or has 25 years of service regardless of age, he/she may apply to the Office of Personnel Management (OPM) for discontinued service retirement.

December 6, 1995

B. <u>Severance Pay:</u> Severance pay is based on a formula of one week of pay for each year of the first 10 years of service, and two weeks of pay for each year of service beyond 10, with a 10 percent add-on for each year over age 40. An employee's total severance pay fund cannot exceed 52 weeks of pay. Severance pay is paid biweekly until the fund is exhausted, and is terminated if the employee is reemployed by the Postal Service or another federal agency.

C. <u>Voluntary Placement in Craft Position:</u> An employee who meets the qualifications for a vacant craft position may volunteer for placement into that vacancy subject to the approval of the manager of the unit. Seniority and pay would be determined by the applicable bargaining unit agreement.

D. <u>Early Optional Retirement/Resignation:</u> Available only in competitive area(s) where incentives are being offered to employees who resign or apply for approved early optional retirement.

V.    SALARY TREATMENT

A. An employee placed into a lower grade position as the result of these procedures will be reduced to the grade of the positions in which they are placed on the effective date of the RIF.

B. An employee's salary at the time of placement into a lower grade position will be retained for two years. At the end of the salary retention period, the salary will be reduced to the maximum of the lower grade, or retain present salary, whichever is lower.

VI.    POST-RIF PLACEMENT PERIOD .

All employees remaining unplaced at the conclusion of the RIF will be retained on the rolls of the Postal Service in a non-duty, non-pay status for a period of 30 calendar days following the effective date of the RIF. During the first week of this period, they will receive a listing of all vacancies within the commute area, and they may apply noncompetitively for any vacancies for which they are qualified at or below their current grade.

VII. RECALL RIGHTS

For two years from the date of separation, employees will receive priority consideration for vacancies for which they are qualified. This priority consideration is limited to competitive areas within commuting distance of the competitive area from which they were released and which are not undergoing a RIF.

**EXHIBIT 3**





IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

OLIVER STEVENSON, JR.,                    :
               PLAINTIFF                 :
                                 :
           VS                        :    NO.  1:CV-00-00274
                                 :
WILLIAM HENDERSON, POSTMASTER GENERAL,:
               DEFENDANT                 :


DEPOSITION OF:   OLIVER STEVENSON, JR.

TAKEN BY:        DEFENDANT

BEFORE:          DAWN YOUNG DIETRICH
                 NOTARY PUBLIC

DATE:            JUNE 19, 2002, 3:53 P.M.

PLACE:           U.S. ATTORNEY'S OFFICE
                 228 WALNUT STREET
                 HARRISBURG, PENNSYLVANIA


APPEARANCES:

    OLIVER STEVENSON, JR., PRO SE

        FOR - PLAINTIFF

    UNITED STATES ATTORNEY'S OFFICE
    BY: MATTHEW E. HAGGERTY, ESQUIRE

        FOR - DEFENDANT

2

## TABLE OF CONTENTS

### WITNESS

FOR DEFENDANT                                    DIRECT

Oliver Stevenson, Jr.                               3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

```
 1                        STIPULATION
 2            It is hereby stipulated by and between counsel
 3      for the respective parties that sealing, certification and
 4      filing are waived; and that all objections except as to the
 5      form of the question are reserved to the time of trial.
 6
 7            OLIVER STEVENSON, JR., called as a witness,
 8      being sworn, testified as follows:
 9
10                     DIRECT EXAMINATION
11
12      BY MR. HAGGERTY:
13         Q       Mr. Stevenson, how are you?  As I mentioned
14      earlier, my name is Matt Haggerty and I represent the United
15      States in this case, in the complaint that you brought
16      against the postal service in this case.
17                 Have you ever had a deposition taken before?
18         A       A deposition, no.
19         Q       Okay.  Just so you know, I'll give you a few
20      ground rules and we'll just get it set up so we can proceed
21      from there.
22                 Is there any reason why today you couldn't
23      answer my questions or you couldn't understand my questions
24      and answer them truthfully?
25         A       I haven't heard the questions yet.
```

4

```
 1        Q         The questions that I'm going to ask, is there
 2   any reason that you couldn't answer them truthfully?
 3        A         No.
 4        Q         Okay.  Are you under any type of medication
 5   or any--
 6        A         Yes.  Medication, yes.
 7        Q         What is that?
 8        A         Heart medication.
 9        Q         Is there anything that would cause you --
10        A         No.
11        Q         -- not to be able to understand what's going
12   on here today?
13        A         No.  I perfectly understand what's going on,
14   yes.
15        Q         If you answer a question, can I take that to
16   mean that you've understood it and that you are answering it
17   truthfully?
18        A         Yes.
19        Q         Okay.
20        A         Unless I qualify and say I didn't understand
21   it.
22        Q         Right.  And you're welcome to do that and
23   please do do that if there's a problem.
24        A         Yeah.
25        Q         And please answer my questions with yes or
```

5

```
1    no's or some verbal response because the court reporter will

2    be taking down --

3        A        Yes.

4        Q        Okay.  Can you state and spell your name for

5    the record?

6        A        Oliver, O-l-i-v-e-r; Stevenson,

7    S-t-e-v-e-n-s-o-n; Jr.

8        Q        And what is your date of birth?

9        A        9/12/42.

10       Q        And how old are you today?

11       A        Fifty-nine.

12       Q        Okay.  How old were you at the time of your

13   discharge from the postal service, or let me say from the

14   time of the incident of this complaint, the RIF that became

15   the incident for this complaint?

16       A        Almost fifty-five.

17       Q        Okay.  So you were fifty-four at the time?

18       A        Yes.

19       Q        What is your current address?

20       A        Seventeen Ash Street, Mont Alto, Pennsylvania.

21       Q        And how about your phone number?

22       A        (717) 749-7105.

23       Q        Are you currently employed?

24       A        Yes.

25       Q        And by whom are you employed?
```

6

| | | |
|---|---|---|
| 1 | A | Triad Engineering.  Triad Engineering.  All |
| 2 | caps, T-R-I-A-D, Engineering.  Hagerstown, Maryland. | |
| 3 | Q | How long have you been employed there? |
| 4 | A | About nine months, give or take. |
| 5 | Q | What are your responsibilities? |
| 6 | A | I'm a senior technician.  Concrete testing, |
| 7 | nuclear gauge testing, construction inspection. | |
| 8 | Q | Okay.  And prior to Triad, where were you |
| 9 | employed? | |
| 10 | A | Prior to Triad, Pitts.  Same thing, |
| 11 | construction, inspection. | |
| 12 | Q | How about are you married? |
| 13 | A | Yes. |
| 14 | Q | And what's your wife's name? |
| 15 | A | Barbara. |
| 16 | Q | Do you have any kids? |
| 17 | A | Yes. |
| 18 | Q | How many kids do you have? |
| 19 | A | Five. |
| 20 | Q | And what are their ages? |
| 21 | A | Forty -- twins, forty; thirty-seven; |
| 22 | thirty-four and thirty. | |
| 23 | Q | How about -- |
| 24 | A | Not with Barbara. |
| 25 | Q | They're from a prior marriage? |

1     A       Prior marriage.

2     Q       How about your educational background.  What

3  is your highest level of schooling?

4     A       Some college, some paralegal training in New

5  Hampshire.

6     Q       And that was the extent of it, paralegal

7  training in college, or college and paralegal training?

8     A       Paralegal training.

9     Q       In college, okay.

10            So you graduated high school?

11    A       GED.  Pennsylvania GED.

12    Q       And when did you receive your GED?

13    A       Wow.  I don't remember.  Sixty-nine, something

14  like that.

15    Q       Okay.  And you say you received that in

16  Pennsylvania?

17    A       Yes.

18    Q       Whereabouts were you living at the time?

19    A       Allegheny County.

20    Q       We talked for a minute before about your

21  employment.  You said you worked for Triad and Pitt prior to

22  Triad.  How about taking me back from the time you left

23  employment with the postal service.  What is your employment

24  history since you left the postal service?

25    A       Since I retired in 1999, I worked for Pitts

8

1    and I worked for Triad.

2        Q        Okay.

3        A        I'm sorry.  I had a brief period with Ames

4    True Temper Warehouse in Carlisle.

5        Q        Okay.  Let's talk about your employment at the

6    postal service.  When did you begin employment with the

7    postal service?

8        A        February 1966.

9        Q        And where did that begin?

10       A        Pittsburgh.

11       Q        And how long were you in the Pittsburgh

12   office?

13       A        Approximately fourteen years.

14       Q        And you left the Pittsburgh office to go

15   somewhere else?

16       A        Harrisburg.

17       Q        To the Harrisburg office.

18                What was the reason for leaving Pittsburgh to

19   go to Harrisburg?

20       A        Promotion.

21       Q        And what was that a promotion from?

22       A        Multi-position letter sorting machine

23   supervisor to tour superintendent in Harrisburg.

24       Q        To tour superintendent?

25       A        Yes.

1    Q        And what did that entail?

2    A        Shift superintendent.  It's managing Tour

3  One.  Eleven to 7:30 in the evening, you manage the whole

4  tour.

5    Q        And that was in the Harrisburg facility?

6    A        Yes.

7    Q        And how long did you work at the Harrisburg

8  facility?

9    A        Couple years.  Two years maybe.

10   Q        And where did you go from there?

11   A        Management Academy, Potomac, Maryland.  Was a

12 master instructor.

13   Q        And so would that have been considered another

14 promotion or was that just a different --

15   A        It's a plumb assignment within the management

16 ranks of the postal service at the time.

17   Q        So that was something you were happy with --

18   A        Yes.

19   Q        -- receiving?

20   A        Yeah.

21   Q        And that was in 1980?

22   A        1980, 1981, somewhere around there, yes.  I'm

23 sorry, nineteen -- I went to Harrisburg in 1980.  That would

24 have been probably '83.

25   Q        Okay.  And where did you say again that you

1    went?

2        A        William F. Bolter Management Academy, Potomac,

3    Maryland.

4        Q        And what were your responsibilities there?

5        A        I was a master instructor for management

6    techniques, methodologies.  First-line management, mid-level

7    management.

8        Q        And who did you instruct?

9        A        Managers, postal managers.

10       Q        Okay.

11       A        New supervisors and mid-level managers, senior

12   managers.

13       Q        And how long were you there?

14       A        Approximately two years.

15       Q        So that takes us to 1985.  Where did you go in

16   1985?

17       A        Boston.

18       Q        To the main facility in Boston?

19       A        The main facility in Boston, yes.

20       Q        And what were your responsibilities there?

21       A        Was a tour superintendent, Tour Three.

22       Q        203?

23       A        Tour Three, shift three, afternoon shift.

24       Q        Okay.  If you could just bear with me, I don't

25   know the --

11

1        A        Gotcha.

2        Q        -- postal service as well as you do and she

3    doesn't either.  So if you could just try and --

4        A        Three to 11:30 was my responsibility in

5    Boston.

6        Q        Okay.  So you went in 1985 to Boston.  And how

7    long were you in the Boston office?

8        A        In the Boston office.  I don't understand your

9    question.  Do you mean the Boston office itself?

10       Q        You said you were in the Boston main office

11   when you --

12       A        I was in the main office for -- how long was I

13   in Boston totally?

14       Q        Right.

15       A        Until 1997.

16       Q        And did you remain in that position that you

17   went to --

18       A        No.

19       Q        -- Boston in?

20                When did you get a promotion in Boston?  When

21   was the first time you received a promotion in Boston?

22       A        Promotion -- I was senior manager distribution

23   operations in I'm going to say 1993.  I'd have to check my

24   form, but around 1993.

25       Q        And you became -- would you say that again,

1    what you were?

2         A          Senior manager distribution operations.

3         Q          Was that the position you held at the time of

4    the reduction in force?

5         A          Yes.

6                    Qualify that.  The position -- I was a POAC,

7    post office activation coordinator.  I bid a position as a

8    senior manager.  The postal service, when they cut a Form

9    50 -- Form 50 is a personnel action that becomes your

10   position.  I was -- this was a temporary position, but with

11   a Form 50, if it makes sense to you, it was a cut position.

12   It was the activation coordinator for the new Waltham

13   facility.  I liaisoned between the contractor's local

14   government, the builders, senior management of Washington

15   and senior management of Boston.

16        Q          Did you have at this time -- and let's talk

17   about the last few years while you were in Boston.  Did you

18   have bosses that supervised you at that time?

19        A          Bosses?

20        Q          Supervisors?

21        A          Yes.

22        Q          And who were they?

23        A          It was Frank Manganaro, Deborah Albert,

24   Kenneth Winters.  Various people various times.

25        Q          Okay.

13

```
 1        A         John Platt, P-l-a-t-t.

 2        Q         Have you filed prior lawsuits before the one

 3   that we're here for today?  Have you filed lawsuits before?

 4        A         Against the postal service, no.

 5        Q         Let me ask you in general, have you filed

 6   other lawsuits?

 7        A         No.

 8.       Q         This is the first lawsuit you filed?

 9        A         Yes.

10        Q         How about any other administrative claims or

11   inter-postal claims for discrimination or other types of

12   grievance forms, have you filed previous claims?

13        A         Other than this --

14        Q         Correct.

15        A         -- particular action, no.

16        Q         How about a criminal background.  Have you

17   been arrested before?

18        A         No.

19        Q         Any felonies or misdemeanors in your past?

20        A         No.

21        Q         At the time -- what was the date that you

22   would say that -- if we can go back to the date of this

23   reduction in force that started the events that have led to

24   this lawsuit, what would you say the first date was back

25   that the reduction in force came down.
```

1      A        The first date?

2      Q        The dates that the reduction in force came

3   down.

4      A        I wouldn't have a clue what the date was, you

5   know.  I was a post office activation coordinator for

6   Northwest Boston, which meant I knew that thirty to forty

7   percent of the Boston facility was going to move to

8   northwest Boston.

9      Q        Right.

10     A        All of us, all the managers, senior managers,

11  knew that there was going to be some type of action.

12  Previously the postal service, when they had a RIF, a

13  reduction in force, found work for all the people and --

14     Q        Can you give me a general date on when you

15  became aware of this reduction in force?

16     A        I'd say around 1995 as a general date.

17     Q        And what was your grade within the postal

18  service at the time?

19     A        EAS-25.

20     Q        And what does that mean?  If you can explain

21  briefly how the grading works at the postal service.

22     A        Yes.  It's an executive service level

23  twenty-five.  There isn't much above that until you go into

24  the PCs and PCES, postal career executive service.

25     Q        And how would you go from an EAS to a PCES?

15

```
 1      A         Depends on where you're at.

 2      Q         In Boston, how would that work?

 3      A         You're asking me how they do it in Boston?

 4      Q         Yes.

 5      A         Have to be born there and, you know, just be

 6   grown up there.  That's the way they do it in Boston.

 7      Q         And what is a PCES, if you could explain that

 8   briefly?

 9      A         Postal career is a senior manager.  All postal

10   executives you take -- you go into another scale.  Postal

11   managers and then there's postal executives.

12      Q         Okay.  At the time of -- in your career with

13   the postal service that spanned thirty years, what did you

14   start at when you -- in 1966, what was your grade level when

15   you started?

16      A         I forget the levels.  I was a sub-clerk or a

17   temporary clerk or temporary indefinite clerk or something

18   like that.  Temporary indefinite clerk.

19      Q         But you don't remember what your EAS was?

20      A         I remember how much money I made.

21      Q         How much money did you make?

22      A         Two dollars and fifteen cents an hour.

23      Q         And would it be fair to say that from 1966 to

24   1995 your EAS level continued to go up as you gained

25   experience?
```

16

1      A           Yes.  I achieved a high rank in the postal

2   service, yes.

3      Q           And you indicated earlier that it was pretty

4   much as high as you can go within the EAS level, EAS system?

5      A           Was about it.

6      Q           Okay.

7      A           There may be some level 26's still around, but

8   those are kind of gone.  There used to be a bunch of them,

9   but there's no longer.  Now they're PCES's.

10     Q           I'd like to get back to your job, your

11  employment history, just to get a sense of you were in the

12  Boston office at the time this reduction in force took

13  place.  Without getting into the specifics --

14     A           Was I in the Boston office, yes.

15     Q           Okay.

16     A           I was in the Boston district.  I was under the

17  Boston mail processing district, yes.

18     Q           And where specifically was your office?  Where

19  did you work day to day?

20     A           Give me a time frame.

21     Q           Where was the last place that you worked

22  before you moved -- before you took the job?  Was it

23  Fayetteville?  Where was the --

24     A           Fayetteville.

25     Q           Where were you stationed at the time that

1    you --

2        A        The last place I worked was in the director of

3    city operation -- the director's office.  I worked under the

4    director.

5        Q        And where was that located?

6        A        In Boston, Boston city itself.

7        Q        Do you remember the address?

8        A        Well, I'm sure it's on the file someplace, but

9    no, I don't -- offhand, I can't.

10       Q        Okay.  And you at some point were informed of

11   this reduction in force and you ended up in Fayetteville, is

12   that fair to say?

13       A        No.

14       Q        We're skipping over a little bit, but --

15       A        You're skipping over a whole lot.

16       Q        I'm trying to find out -- your last employment

17   was with the director in Boston.

18       A        My last employment was my POAC job.  My post

19   office activation coordination job finished.  Technically I

20   was a senior manager distribution operations on Tour Three

21   detailed to a special assignment.

22       Q        And then the reduction in force --

23       A        Before.  This was after the reduction in

24   force.  This was after the reduction in force letters were

25   given.

18

1      Q        And what I'm trying to find out then is how --

2   where did you go from the position that you've just

3   described to -- you ended up in Fayetteville at some point.

4      A        That's where I went, to Fayetteville.

5      Q        And did you ever have a time where you were

6   not working?  Did you have a month or two or three that you

7   were not working or were you transferred directly from the

8   Boston office to Fayetteville?

9      A        I was moved directly from the Boston office to

10  Fayetteville, yes.  You know, was there a week or two I had

11  for a leave or whatever, yes, absolutely.  You know, travel

12  time or what have you, yes.

13     Q        Where is Fayetteville?

14     A        South.  It's by Chambersburg.  17222.  It's my

15  choice for the office.

16     Q        Okay.

17     A        Pennsylvania was my choice.

18     Q        Okay.  And what was your title at

19  Fayetteville?

20     A        Postmaster.

21     Q        And what level was that?

22     A        Eighteen.

23     Q        And as a result of going from a twenty-five to

24  an eighteen, does your salary decrease as well?

25     A        Well, yeah, yeah.  This is the only time we

1    did that.  The postal service before didn't do that.  They

2    had save grade for the rest of the postal person's career.

3    In this particular case, they allowed no save grade for

4    non-veterans.

5        Q        You're saying non-veteran?

6        A        I'm a non-veteran.  I'm not a veteran of the

7    armed forces.

8        Q        And they treated veterans and non-veterans

9    differently?

10        A        Yes.  I'm not concerned with the veteran.  I

11    understand what the rules are.  I'm concerned with the

12    non-veterans that were left.

13        Q        All right.

14        A        Three of us.  That's my concern.

15        Q        So we're clear, though, at no point did you

16    lose your job?

17        A        Yes.  I lost my -- well, I lost my level,

18    yes.  I got a save grade for two years.  I went to a level

19    eighteen.

20        Q        Right.  You lost your grade level?

21        A        I lost my grade level, yes.

22        Q        And salary was decreased as a result of that?

23        A        Salary was decreased after two years.

24        Q        So when you moved from Boston to Fayetteville,

25    you went to an eighteen grade level --

1  A       Yes.

2  Q       -- but you stayed at your salary for two

3  years?

4  A       Yes.

5  Q       And do you remember when that salary -- did it

6  then return to a grade eighteen?

7  A       No.  Because at that time I was on a higher

8  level in Harrisburg.  It was a twenty-four.  I was an acting

9  level twenty-four in Harrisburg.

10  Q       So are you saying by the time the two years

11  was up you had gotten yourself back to a twenty-four?

12  A       I had gotten myself into a temporary

13  twenty-four as the senior manager distribution operations

14  for Harrisburg.

15  Q       Okay.  So at any time did your salary --

16  A       Yes.

17  Q       -- reduce?

18  A       Yes.

19  Q       And when did that happen?

20  A       Salary reduced two years after I left.  Would

21  have been 1999.  Probably like August or June or July --

22  July of 1999.

23  Q       When you were in the Harrisburg office?

24  A       Yes.

25  Q       And why did it reduce, why did it come down?

```
 1        A          Because I went to a level eighteen.  I dropped
 2   seven levels.  That was the position that was offered.  That
 3   was the only way I could stay in the postal service.
 4        Q          And correct me if I'm wrong, but what I
 5   understood you were saying before is when you left Boston
 6   you went to Fayetteville and at a level eighteen --
 7        A          Yes.
 8        Q          -- but you had a save salary period for two
 9   years?
10        A          Save salary -- again, it's a concept.  It's a
11   strange government concept.  I was a level twenty-five in
12   Harrisburg -- in Boston.  The minute I went to Fayetteville
13   I became a level eighteen with a save grade for two years.
14   I didn't get a raise as a level eighteen.  I got -- because
15   I was at a higher rate of pay.  And that lasted for two
16   years.
17        Q          So let me -- do you remember the date when you
18   went to Fayetteville?
19        A          July 1997.  Now, let me just be sure here.
20                   In the interest of not looking it up, it was
21   July 1997, I know that.
22        Q          Okay.  Because the RIF I think went into
23   effect in May of 1997?
24        A          Yes.
25        Q          At the end of May.
```

```
 1              So in July of 1997, you were sent to the
 2    Fayetteville office to be the -- you accepted the position
 3    in the Fayetteville office to be the -- what was the
 4    position?
 5         A         Postmaster.
 6         Q         Postmaster.
 7              And at the Fayetteville -- at that time you
 8    were reduced to an EAS-18 --
 9         A         Yes.
10         Q         -- with a two-year save salary?
11         A         There you go.
12         Q         So correct me if I'm wrong that your level
13    came to eighteen, but you maintained an EAS-25 salary for
14    two years?
15         A         Yes.
16         Q         So that would take us to July of 1999?
17         A         Yes.
18         Q         And you indicated that by the time July of
19    1999 came around you had gotten yourself to a temporary
20    EAS-24?
21         A         Yes.
22         Q         Okay.  So my question originally was, when did
23    your salary become reduced as a result of your transfer to
24    Fayetteville?
25         A         It would have been July of 1999.
```

1    Q        Ninety-nine.

2             And what was the reduction of salary, do you

3    remember?

4    A        Moneywise?

5    Q        Yes.

6    A        Approximately from seventy-five thousand to

7    fifty-two thousand.

8    Q        Were you being paid in July of '99 as an

9    eighteen or a twenty-four?

10   A        As a twenty-four because of -- I was

11   performing duties in a higher level.

12   Q        Right.  So you're saying that from twenty-five

13   to twenty-four is about a twenty-five thousand dollar

14   reduction?

15   A        No, from twenty-five to eighteen.

16   Q        So you were being paid as an eighteen in July

17   of '99?

18   A        But then I got -- we're confused.  My position

19   was a level eighteen.  My Form 50 official position was a

20   level eighteen.  I was on higher level.  I was getting six

21   grades above that level which ran out in December of 1999.

22   There was no position.  They weren't going to make a

23   position.  And therefore I would have reverted to my regular

24   position.  I retired in 1999.

25   Q        So you retired.  When did you retire in '99?

24

1     A       December 31, 1999.

2     Q       So how many months would you say you received

3 a lower salary, if any?

4     A       How many months would I have received a lower

5 or did I receive?

6     Q       No, did you receive.

7     A       None because I was on a higher level.

8     Q       And you retired.  So again, correct me if I'm

9 wrong.  Your salary -- while you worked for the postal

10 service after leaving Boston, your salary never went below

11 the level that it was in Boston?

12     A       Correct.

13     Q       Okay.

14     A       For two years.

15     Q       And then you retired?

16     A       Well, yeah.  You know, I retired after a

17 certain -- you know, six months after that because I was

18 receiving a higher level salary in Harrisburg.

19     Q       Okay.  How about your performance reviews

20 while an employee at the postal service.  Were you evaluated

21 regularly --

22     A       Sure.

23     Q       -- as an employee?

24             Over the course of your employment with the

25 postal service --

1     A        Yeah.

2     Q        -- do you ever remember getting negative

3  evaluations or poor evaluations?

4     A        Yes.

5     Q        Okay.  Did it happen while you were in the

6  Boston office?

7     A        Yes.

8     Q        And what was the substance of those

9  evaluations?

10    A        It was, you know, a fair to a good and that

11 was changed to a good.  I believe that was someplace in

12 1988, 1989.

13    Q        Okay.  And from 1990 --

14    A        Very goods, goods.

15    Q        But nothing -- did it ever become a problem

16 with your employer that they wanted to speak with you about

17 your evaluations or was it -- did you ever have any

18 problem --

19    A        Obviously you don't work for the postal

20 service.  They always want to speak to you about your

21 evaluations, yes.

22    Q        And I will admit I do not work for the postal

23 service.

24    A        You do the same thing with you when your boss

25 talks to you, so it's the same thing.

26

1    Q        How would you characterize your evaluations
2    from 1990 to '97?

3    A        Good, very good, yeah.

4    Q        And was it ever a problem?  Did you perceive
5    it ever to be a problem that you were getting negative
6    evaluations from '90 to '97?

7    A        No.

8    Q        Did anyone ever approach you to say we're
9    having a problem with your service to the postal service and
10   we think you should try and work a little bit harder or did
11   you have any problems like that while in Boston from 1990
12   to '97?

13   A        Did I have any problems like somebody
14   approached me like that, no.  Have I had discussions with my
15   boss, yeah.

16   Q        I'd like to focus on this reduction in force.
17   And again, please accept that I don't work for the postal
18   service.  So I'd like you to explain as well as you can what
19   happened in this case that eventually has led to where we
20   are in this lawsuit.

21           You filed this lawsuit based upon some actions
22   that were taken by the postal service.  I would like you to
23   take me through that as best as you can from your
24   recollection and I'll probably have a few questions as we go
25   through as to what occurred.

1      A        Early on in the process, 1995, I understood

2   that there was going to be some sort of reduction in force.

3   I then started to seek outside help for other positions such

4   as the one in Manchester, New Hampshire.  I requested a

5   lateral consideration as a reduction in force employee.

6      Q        When you say outside help, what does that

7   mean?

8      A        Well, I wanted to go to -- the postal

9   service -- the last reduction in force, the major reduction

10  in force they had, was in '92 or '93 and they gave

11  counseling and sought job opportunities for all the

12  reduction in force employees and they gave them save grade

13  for the rest of their careers.

14     Q        Do you know if that was postal service policy

15  or that's just the way they operated?

16     A        You know, at the time we're talking about

17  actually thousands of people at that time and, yes, that was

18  postal service policy.

19     Q        Okay.  And so -- go ahead.

20     A        All of a sudden policy got changed for

21  Boston.  There was eleven -- eleven or twelve affected

22  employees if you can -- you know, depends on the way you

23  count them.  Three of us were non-veterans and that becomes

24  a problem for non-veterans.

25     Q        Why does that become a problem?

1     A        Well, you know, because of the selection they

2    made for the gentlemen who stayed, for the two managers who

3    stayed in Boston, for the positions that they were offered.

4     Q        And you say that the two men that were able to

5    stay in Boston were able to stay because they were veterans?

6     A        No.  They were able to -- no.  They were able

7    to stay because they were -- you know, I can't think of a

8    reason.  You know, they were younger than I was.  Obviously

9    I was of almost retirement age and these both gentlemen

10   weren't.

11     Q        Right.  But they were both veterans you said?

12     A        No, no.  They were not veterans.

13     Q        So let's -- before we get --

14     A        Eight of them were veterans, nine of them were

15   veterans, whatever.  But those guys already have their

16   positions.  They have save grade for the rest of their

17   life.  They just are there.  We're talking about the three

18   people who were non-veterans that were affected.

19     Q        So you say of --

20     A        I was the --

21     Q        From your numbers, there was twelve men who

22   were going to be affected by this?

23     A        Eleven or twelve, depending on where you put

24   Dave Coughlin.

25     Q        And there were -- eight or nine of those men

1    were veterans?

2         A         Yes.

3         Q         And that they were taken care of by the postal

4    service?

5         A         Yes.

6         Q         And were all of those men, eight or nine of

7    them, younger than you?

8         A         Not necessarily.

9         Q         Some were older than you?

10        A         Not many, but --

11        Q         Some were?

12        A         Some were, yeah.

13        Q         But they were taken care of?

14        A         It's automatic.  It doesn't make any

15   difference.  They could have been ninety because --

16        Q         Because they were veterans?

17        A         Veterans, yes.

18        Q         And I don't want to jump ahead.  I don't think

19   we have.  But so this reduction in force comes down.  Twelve

20   men are going to be affected in the Boston area.

21        A         The threat of the reduction in force came down

22   and you're asking what I did.  I started to write letters

23   saying, help me out.  I'm willing to travel, I'm willing to

24   relocate.  Find me a position in different areas.  I

25   wrote -- asked for help from the human resource people, I

1    asked for help from the area human resource people, from

2    headquarters' human resource people.

3         Q         Do you remember when this would have been?

4         A         It's all in the papers, you know.  Bring them

5    all out.

6         Q         Off the top of your head, you don't?

7         A         1996, '97.

8         Q         So about a year before?

9         A         Yes.

10        Q         So a year before the actual letter came

11   down --

12                   (Discussion held off the record.)

13   BY MR. HAGGERTY:

14        Q         So you wrote letters and --

15        A         I wrote letters, made phone calls, yes.

16        Q         What were the results of those letters?

17        A         The postal service decided that they no longer

18   wanted to apparently go with the policy of finding positions

19   for RIF affected employees, reduction in force affected

20   employees.

21        Q         Okay.

22        A         This is what I was told.

23        Q         And so you had -- nothing good came of these

24   letters.  Then how did you proceed?

25        A         I guess went along and, you know, received two

1    offers of positions and --

2        Q        What two offers did you receive?

3        A        Received an offer for a level eighteen.  I

4    think it was some kind of analyst position.  I was handed a

5    paper for a level twenty-two position, which I looked at and

6    it was taken back and said, woop, we gave you the wrong

7    paper.  Then they handed me a paper for a level eighteen

8    position and I said, no, I don't want to do that.  I'm not

9    qualified, I'm not -- I know nothing about this particular

10   position.

11               That was taken off the table and I was offered

12   a position as a manager in a priority mail facility in

13   Boston, a position that was due to be abolished in four

14   months.

15       Q        And how did you know that it was due to be

16   abolished?

17       A        We were going to go with Emery as our --

18   everybody knew it was an abolished position, it was no

19   longer there.

20       Q        And what level was that?

21       A        Level twenty.

22       Q        So you were offered an eighteen -- position of

23   eighteen?

24       A        Yes.

25       Q        And you didn't want it?

32

1       A       Yes.

2       Q       And then -- so you said no?

3       A       Yes.

4       Q       And then you were offered a position of level

5  twenty that you declined because you were under the belief

6  that it would have been --

7       A       For several reasons.  One of them, it was --

8  you know, it was going to be -- it's an abolished position

9  that, you know, it was just, you know --

10      Q       Okay.  As a reduction in force happens -- and

11 again, I'm asking you because I don't know how it works at

12 the postal service.  You are notified by a letter that you

13 are going to lose your position in Boston?

14      A       Yes.

15      Q       And let me ask you for purposes of this

16 discussion, if you didn't do anything about it --

17      A       Yes.

18      Q       -- would you lose your job within the postal

19 service?

20      A       Yes.

21      Q       Did you ever lose your job within the postal

22 service?

23      A       No.  But I would have if I hadn't wrote the

24 postmaster general.

25      Q       So you wrote the postmaster general?

1      A        Yes.

2      Q        And at some point you received another offer

3  in Pennsylvania?

4               And if I'm jumping ahead, let me know.

5      A        You're jumping ahead.

6      Q        Okay.  Tell me what happened after you

7  declined the job --

8      A        I wrote the postmaster general a letter and --

9  because there was no viable job offer for me.  The

10  postmaster general directed the director of human resources

11  in the northeast area to sit down and try to resolve this.

12  And what they did was sit down and try to resolve it.

13              Asked me where I wanted to go in the country.

14  I told them, well, Pennsylvania sounds good.  And we came up

15  with this position in Pennsylvania.  Not the position I

16  asked for, not the level I asked for, nowhere near it, but

17  this is what the position they come up with.

18      Q        Did they tell you why they couldn't --

19      A        Because the postal service no longer --

20  because as Mr. -- you know, I've got some documentation

21  there and we can bring that up.  A gentleman wrote a letter

22  saying that the positions at my level were hard to place and

23  managers were very careful about who they put in those

24  positions.

25      Q        But was it your understanding that if a

1    reduction in force did occur the post office had any

2    obligation?

3        A        Yes, absolutely.  They did before.

4        Q        But you don't know -- do you know if that was

5    policy or they just did it in the past?

6        A        I don't know if it was a policy.  All I

7    know is that I got a letter from some gentleman at

8    headquarters that said this is our new act, this is our new

9    direction.  You know, as far as it being a policy, I'm sure

10   it's on paper someplace that they decided to do this in

11   Boston.

12       Q        So you would admit that if you didn't write

13   the letter to the postmaster general --

14       A        I'd have been gone.

15       Q        -- you would have just been discontinued as an

16   employee of the postal service?

17       A        Yeah.

18       Q        You didn't.  You wrote the letter to the

19   postmaster and he asked -- who did he ask to work it out

20   with you?

21       A        Mary Burrell or somebody in human resources in

22   the northeast area.

23       Q        And you say they worked it out with you, they

24   got you this position in Pennsylvania?

25       A        Well, they offered me a position in

35

1   Pennsylvania, yes.  And this is a position -- not the

2   position I asked for, not the position I was qualified for.

3   I mean, I never was a postmaster.  It's again, you know, a

4   position that I was absolutely, totally non-qualified for

5   literally.

6        Q       And a position that could drop you seven

7   levels from your EAS?

8        A       Seven, count them, yeah.

9        Q       But saved you for two years at the same salary

10  you were making in Boston?

11       A       Yes.

12       Q       As part of this agreement or as part of you

13  taking on this position in Fayetteville, were there other

14  negotiations as to what the postal service would do for you?

15       A       Or what they expected me to do for them, yes.

16       Q       Let me ask you what you wanted the post office

17  to do for you.  In issue, you owned a home in Boston or

18  somewhere around Boston?

19       A       Yes.

20       Q       And there were some issues as to that.  Can

21  you please tell me what you wanted from the postal service?

22       A       I lost money on my home in New Hampshire.  I

23  paid on it for twelve, eleven years, whatever and I bought

24  it at the height of the market and I lost money on it when I

25  went to Pennsylvania.

1    Q        Where was the home?

2    A        Derry, New Hampshire.

3    Q        And what year did you buy it?

4    A        1986.

5    Q        Do you remember what you paid for it in 1986?

6    A        A hundred and five thousand.

7    Q        And so now in 1997, if it were to go on the

8    market, you didn't believe you could receive --

9    A        Guaranteed I couldn't receive -- yeah, I

10   couldn't.

11   Q        And you were looking for what?

12   A        I was looking -- at the time I was

13   requesting -- I wanted the difference.  You know, pay me the

14   difference on what the house would have cost me, on what my

15   loss on housing equity was.  I did receive some money

16   eventually due to housing loss equity.  At the time I was

17   told there was no such program.

18   Q        And did they indicate that they would do that?

19   A        No.  At the time, no.

20   Q        At any time did they indicate that they would

21   do that?

22   A        Did I find that loss of housing equity -- did

23   they indicate, no.  I found a loss of housing equity office

24   that was referred to me and I requested -- I personally

25   requested that they do this.  Boston as far as I know had

1    nothing to do with this.

2       Q       And what were the results of your asking the
3    equity office?

4       A       They gave some difference.  You know, they
5    decided on a number.

6       Q       Do you remember what it was?

7       A    .    Offhand, no.  In the thousands, you know.
8    Thirty-eight thousand, something like that, minus the taxes.

9       Q       Did you sell your home in New Hampshire?

10       A       I settled my home in New Hampshire with the
11    mortgage company.

12       Q       And when you say that --

13       A       Mortgage company took it back.

14       Q       Okay.  And the postal service gave you
15    thirty-eight thousand dollars as part of your loss of equity
16    in the home?

17       A       Part of -- yes, yes.

18       Q       Okay.  Did you at any time indicate that if
19    that was the case, if the postal service would do that, that
20    it would resolve in your mind any issues you had as far as
21    filing any kind of claim with the Equal Employment
22    Opportunity Commission or filing any claims against the
23    postal service?

24       A       At one time, yes.  If they would have agreed
25    to do that at that time, yes, I would have done it.  They

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

38

1    didn't do that.

2         Q        And what, did it take too long for you or --

3         A        No.  They didn't do it.  I don't think you

4    understand.  They didn't -- nobody gave me that offer.  I

5    said, all right, put an offer on the table.  Here's what I

6    want and, you know, come back to me.  And they said, no,

7    they're not going to do that.  And I said, okay, thank you.

8         Q        And again, correct me if I'm wrong.  Didn't

9    you indicate that you were paid thirty-eight thousand

10   dollars?

11        A        No.  What I indicated was that I sought that

12   out at a later date.  An attorney for the postal service --

13        Q        After you were in Fayetteville?

14        A        This was not -- yes.  And at the time I said,

15   no, you know, this was -- I wanted the deal done before I

16   left, you tell me before I left, and they wouldn't do that.

17   They said, no, this is not a viable option; no, they weren't

18   going to do it.

19                 I got nothing more from the postal service

20   than the house or, you know, any other employee would have

21   had except I got a long time people telling me that there

22   was no such office, that they had no such policy, when they

23   do.

24        Q        And were you aware that other people -- this

25   was something that went on in the postal service?

1    A        I was aware that other people were bought out

2  for their houses, yes, absolutely.  I mean, you know, other

3  people could have been at a different level, but I know

4  other people who were bought out, yes.

5    Q        So you never lost your employment with the

6  postal service?

7    A        No.

8    Q        And this change in your employment was the

9  result of a reduction in force?

10    A        No.  This change -- you know, at one -- at

11  several steps above that, yes.

12    Q        Right.  You indicated earlier that a reduction

13  in force came down and if you did nothing about it you would

14  have lost your job at the postal service; is that correct?

15    A        Yes.

16    Q        And instead you sought out help, you applied

17  for different positions, you were willing to move?

18    A        Yes.

19    Q        And therefore you maintained your employment

20  within the postal service?

21    A        No.  No.  I was given no help.  The only help

22  I was given was the director I assume from the postmaster

23  general to resolve the situation.  There was no formal

24  help.  This was, I mean, literally the last day decision.

25    Q        Maybe I worded it poorly.  You received a

1     job --

2         A         Yes.

3         Q         -- within the postal service at an EAS-25

4     level with a save grade salary?

5         A         No.  I received a job within an EAS-18 level

6     which, you know, is entirely different than receiving a

7     level twenty-five position like as I requested.

8         Q         Right.  I thought that's what I said.  But

9     your new job in Fayetteville was an EAS-18?

10        A         Yes.

11        Q         Seven levels lower than you were?

12        A         Yes.

13        Q         But your salary was not affected for two years

14    because of the save salary?

15        A         Okay, yes.

16        Q         What other benefits or cognizable effects, if

17    you understand what I'm saying -- if your salary wasn't

18    affected, was anything else affected other than your grade,

19    I mean like a number?

20        A         Number, my grade.  I was no longer a level

21    twenty-five.  I was no longer a senior manager, no longer in

22    the position that I worked for.

23        Q         Right.

24        A         And that I was experienced.

25        Q         But your benefits, they didn't change?

41

```
 1      A        You're going on tangible.  You're not --

 2      Q        For now that's what I want to focus on.  I

 3  just want to focus on --

 4      A        Well, yeah, I changed.  I lost my house in New

 5  Hampshire because I couldn't afford it and I moved into a

 6  place, you know, and I still -- I am still paying money for

 7  the loss.  If you're asking me what happened, you know, it

 8  cost me money.

 9      Q        I understand that.  But just listen to my

10  questions.  I don't dispute that with you.

11      A        Gotcha.

12      Q        But you say you had to sell your house in New

13  Hampshire.

14      A        I had to settle my house with the mortgage

15  company, yes.

16      Q        Because you were moving?

17      A        Because I lost my position in Boston, yes.

18      Q        And therefore you had to move.  And your

19  salary didn't change -- you settled your house because you

20  were moving; is that correct?

21      A        I settled my house because I was forced to

22  move.

23      Q        Right.

24      A        That's correct.  I was forced to move, yes.

25      Q        You were forced to move because you were
```

1    offered another job within the postal service?

2        A        The only position that was viable that was

3    offered to me was six hundred miles away, yes.

4        Q        And would it be fair to say that that was as a

5    result of the reduction in force?

6        A        That was a by-product of the reduction in

7    force, not a result.

8        Q        Right.

9                 At any time did somebody come to you and say

10   we're letting you go because of your age?

11       A        No.  Directly, no.

12       Q        At any time did anyone, any of your

13   supervisors or anyone within the postal service, say to you

14   anything about your age that you were --

15       A        Yes.

16       Q        What was said?

17       A        You know, I was eligible to retire, I could,

18   you know, pick up a three-month early, that everybody was

19   aware of that.

20       Q        Okay.  That you were eligible for retirement?

21       A        Yeah.  Well, I was going to retire.  I wasn't

22   going to lose my job.  I was going out on an early

23   retirement.  Early retirement would have been three months.

24   Wasn't getting fired.  I was -- you know, my position was no

25   longer there.  The position on paper was no longer there.

43

1     Q        So the reduction in force if you did -- say
2  you wanted to retire after the reduction in force.  Could
3  you have retired at that point?
4     A        Yes.
5     Q        At an EAS-25?
6     A        At an EAS-25?  No.  I was an EAS-18.
7     Q        I'm talking about when you were in Boston when
8  the reduction in force came down.
9     A        No.  I could -- I wasn't old enough.  I was
10 within several months, yes.  I could have left in July which
11 was several months before my fifty-fifth birthday and, yes,
12 I was eligible to retire at fifty-five.
13    Q        So when you became eligible for retirement,
14 your level was different.  You were an EAS-18 in
15 Fayetteville but your --
16    A        Yes.
17    Q        -- salary was the same?
18    A        Okay.
19    Q        And again, that's just -- I understand you
20 have your own --
21    A        You have a perspective on that and it's
22 entirely different than mine.
23    Q        Right.  And that's fair and you'll have your
24 opportunity to present that.
25    A        Yes.

44

```
 1        Q        But I'm just trying to -- from my standpoint
 2   trying to figure out what's going on here and -- because I
 3   believe that it's important and --
 4        A        Important to what?
 5        Q        To the case.
 6        A.       Oh, okay.
 7        Q        So you went to Fayetteville -- and we went
 8   over this before, but I want to just make sure that we know
 9   that you went to Fayetteville in July of 1997?
10        A        Yes.
11        Q        And you worked in Fayetteville until when?
12        A        I'd say six months and I was on a detail to
13   Harrisburg.
14        Q        And what did you do after six months?
15        A        I went up to work on the optimum program in
16   Harrisburg.  And after three months there, I was assigned as
17   the temporary or appointed as the temporary senior manager
18   distribution operations in Harrisburg.
19        Q        Okay.  And so that's now -- and that's nine
20   months.  And how long were you in that position in
21   Harrisburg?
22        A        Approximately nine months, something like
23   that.
24        Q        So now we're talking eighteen months since you
25   left Boston?
```

45

| | | |
|---|---|---|
| 1 | A | (Witness nods head affirmatively.) |
| 2 | Q | And what happened, what did you do then? |
| 3 | A | Retired. |
| 4 | Q | You retired? |
| 5 | A | Yeah. |
| 6 | Q | So we're talking eighteen months? |
| 7 | A | I retired in December of 1999. |
| 8 | Q | And again, I do not belabor the point, but |

9   your save salary that we talked about was two years?

10      A      Yes.  Well, anybody in the postal service who
11   went to a lower grade presently has save salary forever.  At
12   the time that I went, anybody in the postal service, all
13   eight hundred and eighty thousand employees, had a minimum
14   of two years save grade.  So it wasn't a benefit.

| | | |
|---|---|---|
| 15 | Q | Right.  Everybody got it? |
| 16 | A | Yeah, everybody got it. |
| 17 | Q | So what I had mentioned earlier and the point |

18   I'm just trying to make -- and I know there's other issues,
19   but your salary remained the same --

| | | |
|---|---|---|
| 20 | A | Gotcha. |
| 21 | Q | -- until you retired? |
| 22 | A | My paycheck didn't blink. |
| 23 | Q | Right, right. |
| 24 | | And it was your level that was reduced from |

25   twenty-five to eighteen?

46

```
 1        A        Yes.

 2        Q        Okay.

 3        A        And my retirement benefits.

 4        Q        They did what?

 5        A        Reduced.

 6        Q        They were reduced --

 7        A        Yes.

 8        Q        -- as a result of your grade level?

 9        A        Yes.

10        Q        And why is that?

11        A        It was -- I got paid my crude annual level at

12   a level eighteen rather than a level twenty-five.  That was

13   the difference.

14        Q        So all the annual leave that you had stored up

15   that you could cash in on your retirement --

16        A        Yes.

17        Q        -- would be paid out at a lower salary?

18        A        Much lower, yes.

19        Q        And what other things would have been

20   different?  Was that the only thing that was different?

21        A        Tangible.

22        Q        We're still on tangibles.

23        A        Sounds good.  You know, tangible I was making

24   around the same money, yes.

25        Q        And in terms of your benefits, that was -- the
```

1    crude annual leave was one where you could show that you

2    were making less money because you were down another level?

3        A       Yes.

4        Q       And is there any other ones other than that?

5        A       No.

6        Q       Did you believe -- when did you first file the

7    administrative claim in this case?  Were you still working

8    for the postal service at the time?

9        A       Yes.

10       Q       When do you remember filing?

11       A       Administrative claim, you mean the EEO case?

12       Q       Yes, at the administrative level that was --

13       A       Yes, I filed that in -- the minute I got the

14   RIF I filed it in Boston, yes.

15       Q       And do you believe that you were retaliated at

16   all by the postal service because you filed that?

17       A       Yes.

18       Q       And in what way?

19       A       I was told that if I removed it I would, you

20   know, receive better benefits when I left, by the director

21   of human resources in Boston.

22       Q       And who was that?

23       A       Lou Pento.

24       Q       Lou Pento?

25       A       Yes.

48

1    Q        And you didn't withdraw it?

2    A        No.

3    Q        Did you believe something was done to you as a

4    result of not withdrawing it?

5    A        I believe something was done because of my age

6    in Boston.  The selection process was clogged because of my

7    age, that I was discriminated against because of my age.

8    Yes, I do believe that.

9             Is that what you're asking?

10   Q        Well, I was asking whether you felt you were

11   retaliated against because you filed the EEO claim.

12   A        Yes.

13   Q        And in what way?

14   A        I wasn't offered a position -- I didn't get

15   the assistance for a position that I was qualified for that

16   I requested in Lehigh Valley.  Any position within the

17   postal service at the managerial level that I was at, I

18   received absolutely no assistance in getting that.  It got

19   where, well, I made a call for you.  Well, the person didn't

20   answer.  Well, you know, I can't really understand how that

21   could happen.

22             Because if I make a call, I get an answer

23   or -- you know, or I get back to the person.  But there was

24   no help and I believe that was a direct result of -- I

25   believe it was a direct result of the EEO and the position

49

1    that I was in.

2       Q       Right.

3               And when you talk about -- earlier you

4    mentioned your age, you believe that you were not given help

5    because of your age.

6       A       I believe I was not given help because of my

7    age.  I believe that the postal service directly -- Ozzy

8    Barsi, Oswald Barsi, is the postal person in headquarters in

9    charge of the RIF who says that people at my position are

10   difficult to place.  I take that as a euphemism for age.

11              They did it before for thousands of people

12   and, you know, all it would have took was somebody to pick

13   up the phone and place me in a proper position in an office

14   where I was willing to go, and that didn't happen.  I

15   believe that was age, yes.

16      Q       But you don't contend that the reduction in

17   force had anything to do with age?

18      A       Yes, I was reduced in force, yes.  You know,

19   do I -- I believe that age -- that the reduction in force

20   itself had anything to do with age, the fact that it was

21   done?  I don't believe so, no.

22      Q       It was really just you not getting assistance

23   that you were looking for you believe had a little bit to do

24   with your age?

25      A       That's one point.

1      Q       Right.

2      A       We didn't -- you know, we didn't go into --

3  yeah, that is one position, yeah, yeah.

4      Q       And what is the other part that your --

5      A       I wasn't selected for positions that I was

6  told that I would be given consideration for.  The manager

7  of -- director of mail processing in New Hampshire, director

8  of city operations in Manchester, New Hampshire --

9      Q       Let's talk about the first one.

10      A       Sure.

11      Q       The first, director of postal operations.  Is

12  that what you said the --

13      A       No.  I meant the director -- the manager of --

14  the director of city operations in Manchester, New

15  Hampshire, the person who controlled the mail processing.  I

16  requested that position from Mr. Steele and I was told that

17  I would be -- as a RIF employee, I was told I'd be given

18  consideration for it and I wasn't.

19      Q       Was it you were not considered or you just did

20  not get the job?

21      A       I don't believe I was considered.

22      Q       And why do you think that?

23      A       Because of my age.

24      Q       Do you --

25      A       I don't see any other reason.

1     Q     Do you have any idea what the consideration

2  process was?

3     A     No.  But I was told I would be given

4  consideration.  I wasn't interviewed, nobody talked to me

5  about it.  Next thing I know, somebody else got the position

6  who was younger than me and had less experience than me.

7     Q     So you retired in December of '99?

8     A     Yes.

9     Q     About a year and a half after you left the

10  Boston office to go to Fayetteville?

11     A     Yes.

12     Q     So how long after you retired did you start

13  working for Pitts?

14     A     Eighteen months maybe.

15     Q     So you were off for eighteen months?

16     A     Yes.

17     Q     Just enjoying retirement?

18     A     I was off for eighteen months.

19     Q     What type of work did you say you did at

20  Pitts?

21     A     Concrete inspection.  Same thing I'm doing

22  now, yes.  Nuclear gauge testing, soil testing.  Something

23  different.

24     Q     As a result of -- you know, we talked about

25  the tangibles before and I guess in a sense we'll be talking

```
 1    about them here, too, but also other things.  I want to know
 2    as a result of this, as a result of this reduction in force
 3    in which you believe was age discrimination in this case,
 4    did you sustain any physical injuries?
 5         A         I'm not clear.  As a result of a reduction in
 6    force, did I believe -- you're putting words in my mouth.  I
 7    don't believe that the reduction in force was age related.
 8         Q         Right.
 9         A         I believe that the effects to me of the
10    reduction in force -- nobody else, me.
11         Q         Right.  Let me put it this way.  The incident
12    that caused the basis of this complaint --
13         A         Yes.
14         Q         -- okay, did you --
15         A         Incidents.
16         Q         The incidents, plural.  Did you receive any
17    physical damages as a result of these incidences?
18         A         Was I beaten, no.  Physical, no.
19         Q         Any physical manifestations whatsoever?
20         A         No.
21         Q         Okay.  Mental injuries?
22         A         Yes.
23         Q         And could you explain what you mean when you
24    say mental injuries?
25         A         You work someplace for thirty-four years, you
```

53

1    achieve a position of high responsibility, you receive --

2    you're in a senior management position, and all of a sudden

3    you go to a position you know absolutely nothing about.

4    You're told that you're no longer wanted.  It affects you

5    mentally.  If it didn't, you know -- yeah.

6        Q        Okay.

7        A        There's a lot of stress there.

8        Q        And when you say it affects you in stress, how

9    did that manifest itself physically, or did it?  Or was it

10   more of just a --

11       A        Mental.  You don't -- start not believing in

12   yourself.  You go into not mild depression, but you just

13   start don't believing in yourself.  You wonder if it's a

14   self-fulfilling prophecy.  The postal service I believe took

15   the managerial ability away from me for a long time.  I'm

16   just starting to get back to it now.  But, you know, that's

17   a big intangible.

18       Q        Right.

19                And would you say that affected you day-to-day

20   after it happened?

21       A        Yes.

22       Q        That it was something that --

23       A        So there's my eighteen months that, you know,

24   it was -- I was enjoying retirement.  Well, I was retired

25   for eighteen months, not necessarily enjoying it.

54

1    Q        Did you see any health care providers, any

2    doctors?

3    A        Did I see a physician for -- yeah, you know,

4    yes.

5    Q        Okay.  What did you see -- you saw a doctor?

6    A        Yes.

7    Q        And what was his diagnosis?  Did he --

8    A        That I had some stress problems and he

9    diagnosed me with some stress problems and gave me some

10   Prozac.  Put me on Prozac for a while, yes.

11   Q        When did that happen?  When did you do that?

12   A        I'd say October '97 maybe.

13   Q        So while you were still working for the postal

14   service?

15   A        Yes.  At a lower level.  In a lower position.

16   Notwithstanding the salary.  The salary is just one small

17   part of it.  It's the position that the postal service put

18   me in.

19   Q        And how long were you treated by the doctor?

20   A        A year or so.

21   Q        And did you have any bills, any kind of

22   medical bills that --

23   A        Was I -- have any episodes, no.  But was I --

24   you know, to have some stress, yes.

25   Q        No.  But did you incur costs as a result of

1    seeing a doctor for six months or a year?

2        A        Monetary costs, fiduciary costs, mental costs,

3    which one?  Again we're talking tangible and intangible.

4        Q        Money, money.

5        A        You know, fifteen dollar co-payment.  I've got

6    Blue Cross/Blue Shield.

7        Q        What do you believe the postal service did

8    that caused these injuries that you're talking about?

9        A        They selected -- did not select me for

10   positions for which I was qualified for.  Instead they gave

11   them to people who were less qualified than I was.  I

12   believe they did it because of my age.

13       Q        And how many of these positions can you tell

14   me -- who did they hire for these positions and how old were

15   these people that they hired?

16       A        They selected Mr. Powers, Mr. J.W. Mike

17   Powers, a person that they gave a position to at -- a level

18   twenty-two position to.  Considerably younger than I was.  I

19   don't know how old he was at the time, but he was in his

20   early 40s.  And Mr. Charles Lynch, the same thing, in his --

21   those were the three of us.

22       Q        These were the three...

23       A        Non-veterans.

24       Q        Earlier you indicated there was twelve men who

25   were -- men or women.

56

1    A        Twelve persons.

2    Q        Persons who were affected by the reduction in

3    force.

4    A        At least in Boston they were all men, yes.

5    Q        And there were a total of twelve and nine --

6    A        Eleven and twelve.  You've got to figure out

7    where -- there was a position that they kept sliding the guy

8    in and out of.  That's why I asked you to bring a report on

9    Mr. Coughlin down to see what his position is now.  But he

10   was kind of in and out of the mix and I'm still not sure

11   exactly where he --

12   Q        But there were a total of twelve men?

13   A        Eleven or twelve.

14   Q        And there were three of you that were not

15   veterans?

16   A        Yes.

17   Q        And --

18   A        Three affected employees, yes.

19   Q        Three affected employees.

20            And you said two of the three received

21   positions at -- how about -- you mentioned one of them

22   received a position at a level twenty-two.

23   A        Twenty-two or twenty-four, I'm not sure which.

24   Q        And were they EAS-25s as you were?

25   A        No.

1    Q        Did they have to go down --

2    A        Excuse me.  One was an EAS-25, yes.

3    Q        So if he accepted a twenty-two or a

4  twenty-four position of EAS-22 or twenty-four, he would have

5  had to have come down a level as well?

6    A        Yes.  Would save grade for two years.  He

7  wouldn't have lost any money for two years.

8    Q        Right.  But you didn't either.  It would have

9  been the same for both of you?

10   A        Yes.

11   Q        Do you know if both of those men accepted

12 positions at lower levels?

13   A        Yes.

14   Q        And they both did?

15   A        Yes.

16   Q        And how about these veterans, do they get to

17 save grade or just their salary?

18   A        I don't know.  Again, I'm not -- you know, all

19 I'm interested in at the time -- you know, you'd have to go

20 back.  They're save grade, save salary.  They just maintain

21 that.  But I'm not sure -- I'm not a veteran, so I never got

22 into that.

23   Q        And specifically what agency employees, what

24 one of these supervisors were the ones that caused -- that

25 made these decisions that caused your injuries?

1    A        I believe it was from the top down, from

2    headquarters down.  From Mr. Barsi, direction, you know,

3    that they were no longer going to seek -- I believe.  And

4    again, if we sit down with the other gentlemen -- I believe

5    I was the only person who asked for outside assistance.  I

6    was the only person willing to go outside.  At least that

7    was my understanding from conversations with Mr. Powers and

8    Mr. Lynch.

9              They were not willing to travel.  I was.  I

10   believe that their selection was simply because I was older

11   than them, and that's what I believe.

12   Q        How about in 1997, what were your plans for

13   retirement prior to the reduction in force?

14   A        What were my plans?  I was going to work until

15   I was seventy.

16   Q        At the postal service?

17   A        I don't know.  Yeah.

18   Q        Does the post office have an age requirement

19   for retirement?

20   A        No.

21   Q        A minimum or a maximum age requirement?

22   A        Do they have a minimum, yes.  And you have to

23   have so many years.

24   Q        Right.

25   A        Retirement eligibility is not retirement.

1    Retirement eligibility is the age that you can retire with

2    how many years.  Yes, the postal service has that.

3         Q        What was it at the time you were there, do you

4    remember?

5         A        Twenty-five years with age fifty-five.

6         Q        And there was no maximum that you had to

7    retire at age sixty or sixty-five or seventy?

8         A        No.

9         Q        And at the time that were you there, you had

10   no intentions of retiring?

11        A        No.

12               MR. HAGGERTY:  Just give me a second to let me

13   take a look at my notes.

14               (Brief pause.)

15               Mr. Stevenson, that's all I have.

16               (The deposition was concluded at 4:57 p.m.)

17

18

19

20

21

22

23

24

25

60

```
 1    STATE OF PENNSYLVANIA    :
                               :  ss
 2    COUNTY OF DAUPHIN        :

 3

 4              I, Dawn Young Dietrich, a Reporter

 5    Notary-Public, authorized to administer oaths within and for

 6    the Commonwealth of Pennsylvania and take depositions in the

 7    trial of causes, do hereby certify that the foregoing is the

 8    testimony of OLIVER STEVENSON, JR.

 9              I further certify that before the taking of

10    said deposition, the witness was duly sworn; that the

11    questions and answers were taken down stenographically by

12    the said reporter, Dawn Young Dietrich, a Reporter

13    Notary-Public, approved and agreed to, and afterwards

14    reduced to typewriting under the direction of the said

15    Reporter.

16              I further certify that the proceedings and

17    evidence are contained fully and accurately in the notes

18    taken by me on the within deposition, and that this copy is

19    a correct transcript of the same.

20              In testimony whereof, I have hereunto

21    subscribed my hand this 1st day of July, 2002.

22

23

24                              _____
                                Dawn Young Dietrich
25    My commission expires:
      May 5, 2003
```